UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BRENDA CHOATE, Personal Representative of the Estate of Ryan Rideout, <br><br> Plaintiff <br><br> v. <br><br> JEFFREY MERRILL, et al. <br><br> Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil No. 08-49-B-W |

*Recommended Decision on Motion to Dismiss*
*filed by Correctional Medical Services (Doc. No. 116)*

On October 5, 2006, Ryan Rideout died after he hung himself at the Maine State Prison. Rideout's mother, Brenda Choate has sued multiple defendants in her capacity as the personal representative of her son's estate. Choate believes that these defendants violated the United States and the State of Maine Constitutions because they were deliberately indifferent to the prevention of his death once her son was discovered hanging.[1]

Correctional Medical Services (CMS) has filed a motion to dismiss the complaint as to its liability on the constitutional claims. It asserts that it cannot be held liable on a vicarious liability theory and that the Fourth Amended Complaint does not state a claim against it with regards to Choate's theory that, as the contracted medical provider for the prison, it was deliberately indifferent to Rideout's risk of death under the circumstance. Choate has filed a response to the motion to dismiss that includes a request that the court convert the motion into one for summary

---

[1] She also presses state-law wrongful death/conscious pain and suffering counts but makes it clear in her amended complaint that these counts are attached to the constitutional claims. (See Fourth Am. Compl. ¶¶ 38, 39.)

judgment and, towards this end, she has accompanied her response with a statement of facts targeted expressly at CMS.[2]

## *Discussion*

As an inmate, Rideout was entitled to "'the minimal civilized measure of life necessities,'" Wilson v. Seiter, 501 U.S. 294, 298 (1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)), and the denial of necessary medical care can arise to the level of an Eighth Amendment violation, see generally Farmer v. Brennan, 511 U.S. 825 (1994); Estelle v. Gamble, 429 U.S. 97 (1976). However, negligence and medical malpractice are not actionable. Daniels v. Williams, 474 U.S. 327 (1986) (noting that 42 U.S.C. § 1983 provides a right of action for civil rights violations and cannot be used to sue correctional officials for negligence).  CMS can be held liable for a violation of Rideout's Eighth Amendment rights because it concedes that it was responsible for the provision of medical services at the Maine State Prison and that it can be treated as a municipality for purposes of analyzing its liability (Mot. Dismiss at 4).  See Monell v. Department of Social Services, 436 U.S. 658 (1978).

Per Iqbal v. Ashcroft, I identify the conclusory allegations of the Fourth Amended Complaint which are not entitled to the assumption of truth. __ U.S. __, 129 S.Ct. 1937, 1949 (May 18, 2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2207))  Next, to the extent that Choate has pled factual allegations that go beyond conclusions, I must credit them and measure whether they plausibly give rise to an entitlement to relief. Id. at 1950 (emphasis added).  "Determining whether a complaint contains sufficient facts to state a plausible claim for relief will ... be a context-specific task that requires" this court "to

---

[2] Choate has not framed this as a plaintiff's motion for summary judgment.

draw on its judicial experience and common sense." Id.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged- but it has not 'show[n]'" that Choate "'is entitled to relief.'" Id. (quoting Fed. R. Civ. P. 8(a)(2)).

The allegations of the compliant that Choate identifies as stating a claim against CMS are Paragraphs 7, 17, 18, and 37.  (See Consolidated Resp. at 10-11.)   These complaint paragraphs are as follows:

> 7.      Defendant Correctional Medical Services, Inc… contracted with the State of Maine to provide medically necessary and reasonably required health services to prisoners at Maine State Prison, including Ryan Rideout.
> 17.     Neither Defendants Beard, Peters or [sic] other personnel who came to the scene were not [sic] adequately trained in necessary CPR, or were provided adequate and necessary equipment for the provision of which the Defendant CMS and the Department of Corrections were responsible.
> 18.     The disregard by employees of Maine State Prison of the emergency call system, the failure by CMS and DOC personnel to provide timely and proper resuscitation measures and proper equipment which could have saved Rideout's life, as independent acts or omissions and together, constituted a deliberate indifference to the constitutional rights, namely the right to life, of the Decedent Rideout (and other prisoners).
> 37.     The conduct of the Defendants, jointly, severally, individually, and in their representative capacities, in allowing a custom of ignoring the emergency alarms in cells, in providing inadequate training in CPR, and in providing inadequate equipment or training to salvage Rideout's life, and because of the intentional wrongdoing by Defendants Beard and Peters, jointly, severally, individually, and in their representative capacities, deprived the Decedent, Ryan Rideout, of his life under color of State Law, and deprived the Decedent of his rights, privileges and immunities under the laws and Constitution of the State of Maine.

(4th Am. Compl. ¶¶ 7, 17, 18, 37.)

Do these allegations "invite this court to infer more than the mere possibility" of deliberate indifference by CMS  under a policy and custom, see e.g.,  Walker v. Prince George's County, 575 F.3d 426, 431 (4th Cir. 2009)(post Iqbal),  or failure to train, see, e.g., City of Canton v. Harris, 489 U.S. 378, 388 (1989); Oklahoma City v. Tuttle,  471 U.S. 808, 822-23

3

(1985); Kibbe v. City of Springfield, 777 F.2d 801, 804 -06 (1st Cir. 1985). writ dismissed as improvidently granted, 480 U.S. 257 (1987), theory of municipal liability?[3]

CMS insists in its reply that, even if the facts highlighted in Choate's response pertaining to its motion are worthy of consideration, it is entitled to dismissal of the suit as against it. If one looks at the statement of facts submitted by Choate in the non-cognizable part of her response to this motion to dismiss, Choate's summary judgment case would be as follows:

Choate states that CMS was responsible under the formal agreement with the MDOC to: deliver quality health care services (Pl.'s SMF Re: CMS ¶ 2); use professionally trained practitioners who are licensed or certified (id. ¶ 3); maintain all health care supplies, equipment, and furnishing, all in good working order and repair (id. ¶¶ 6, 10 ); provide twelve hours per staff person of in-service training programs for CMS staff and the staff of the MDOC (with some level of training addressed to security staff), including but not limited to CPR certification and recertification, OSHA regulations addressing health care, blood-borne pathogen and tuberculosis protection procedures (id. ¶¶ 8,9, 53); and exercise responsibility for maintenance and repair of state-owned equipment and furnishings, acquiring and maintaining all certification on all medical equipment (id. ¶10).

Choate states that Teresa Kesteloot[4], as CMS's designee, admitted that CMS had responsibility for the proper maintenance of supplies kept on the stretcher/crash-cart in the

---

[3] At least one court applying Iqbal would probably answer yes, despite the conclusory nature of the complaint allegations regarding policy/training. The District Court in Brickell v. Clinton County Prison Bd., concluded that allegations of a total absence of a policy concerning medical treatment for severe burns or general medical care and the inadequacy of prison medical facilities are sufficient to state a claim against, among other defendants, the county, for deliberate indifference to a right to medical care. __ F. Supp. 2d __, __, 2009 WL 2957788, 5 -7 (M.D. Pa. Sep. 10, 2009). Choate does not allege a total absence of a policy with respect to staff training and equipage relating to suicide attempts by hanging but I do not think that the absence of this type of allegation at the pleading stage (thus, yet to be supported through discovery) sufficiently distinguishes Choate's case from Brickell's.

4

medical department; there are various items on the stretcher and a log book, each piece of equipment has a tab, and the items are checked every shift. (Id. ¶¶ 14, 15.) Kesteloot testified that a May 11, 2008, addition to the "Orange Emergency Jump Bag Contents" on the right-side pocket was a Nasal Airway and the Surgi-lubes. (Id. ¶ 18.) There is no sign on the wall above the emergency equipment listing what equipment is to be carried to every Code Blue (Id. ¶ 27.)

Three nurses, Deborah MacLeod, R.N. (a state employee), Cheryl Woods, R.N. and Stephanie Walsh, a Licensed Practical Nurse -- both CMS employees -- were involved in the emergency response to Rideout's suicide. (Id. ¶¶ 54, 55.) The automated external defibrillator (AED) is kept locked in the pharmacy and nurses Walsh and MacCleod indicate that they were never told that the AED and the suction equipment should automatically be taken to all Code Blues. (Id. ¶¶ 27, 28, 66.) Nurse Walsh stated she has never taken the AED to an emergency situation. Nurse MacLeod states it has not been routine to take the AED or the suction equipment along on the emergency stretcher. (Id. ¶ 66.)

There was not– and as of March 26, 2009, there still is not -- a distinction made when Code Blues are called to alert for suicide as opposed to a different medical emergency; the medical staff does not know what they will be responding to so they treat Code Blues all the same (with regards to preparation for response). (Id. ¶¶ 21, 23, 56.) CMS Policy No. P-A-07.1 states: "Medical and Nursing staff with direct patient care are trained to respond to health-related situations within a four-minute response time. The training program will be conducted on an annual basis and during orientation for: Recognitions of signs and symptoms, and knowledge of action that is required in potential emergency situations;[] certification in CPR in accordance

---

<sup>4</sup> In her deposition Kesteloot indicated that she was the health services administrator at the Maine State Prison. (Kesteloot Dep. at 4, Doc. No. 143-3.)

5

with the recommendations of the certifying health organizations; Suicide intervention." (Id. ¶ 29; see also id. ¶ 35.) Ralph Nichols's report indicated that the medical staff took six minutes and 40 seconds to arrive on the scene once the Rideout Code Blue was called. (Id. at 34.)

With regards to the actual performance of personnel on the night of the suicide, after the Code Blue alert, Walsh went to the elevator with the stretcher and its contents, some of which were missing, including the AED which was stored in the locked pharmacy room, which was not retrieved and taken to the cell, although the blue bag which contains IV equipment also stored in the pharmacy was retrieved and taken to the cell. (Id. ¶ 57.) MacLeod reported that the B wing door is normally open, but it was locked when she arrived at it. Nurse Walsh was "stuck in the elevator" for a short time. An officer was sent to help her. She feels this delayed their response to the cell. (Id. ¶ 58.)

At some point after the medical personnel responded to Rideout, Walsh turned to attach the ambu bag to the oxygen tank but did not have the proper tubing to do so. The tip of the tubing she did have was broken. She also reported there was some difficulty setting up the oxygen tank. The key to open the oxygen tank was difficult to locate. An officer had taken over "bagging" while a different officer continued compressions. It also appears that Rideout's neck was still not stabilized. There is a period of time during which no air is being applied to Rideout though compressions are continuing. (Id. ¶ 59.) Walsh stated CPR was continued during transport from the cell to the medical department but that it was difficult to get air into Rideout's lungs. Rideout's neck was not yet stabilized with a cervical collar. (Id. ¶60.) Once in the Medical Department there continued to be difficulty in getting air into Rideout's lungs. Nurse MacLeod got the larger Oxygen tank and tried to find compatible tubing to attach the oxygen to the ambu bag. She had difficulty in finding properly fitting tubing. (Id. ¶ 61.) After being in the Medical

6

Department for more than several minutes, Nurse MacLeod then asked for the AED and she and nurse Walsh placed the patches on Rideout's chest. The AED delivered one shock. Further assessments by the AED did not recommend any shocks. (Id. ¶ 62.)

Dr. Charles Abney, Choate's expert, stated (in January 2009) with respect to his review of the response: "And then eventually they got the defibrillator there, the AED that they talk about, they got it there and it shocked one time. And for an AED to shock, there usually is some cardiac rhythm present, it's usually ventricular fibrillation, or ventricular tachycardia, that's an unstable rhythm that it would shock, so I think at least his heart–at least the defibrillator perceived it to still have electrical activity, but it only shocked one time. So, that made me think that, you know, I don't know when he died. My gut feeling was he was dead when they got in there, but that made me have some doubt about that." (Id.¶ 63.) Abney was unable to say when Rideout actually died because when the officers got to his cell, "they felt they had a chance to save him because his face was white." (Id. ¶ 64.)

Choate highlights the December 11, 2006, Lorraine Spiller report indication: "There was a sense that medical staff did not take a leadership role in medical treating [sic] the prisoner as required by policy." (Id. ¶ 32.) This report also noted:

> Medical equipment and medications necessary for medical staff to respond and treat the prisoner at the scene of a code blue is not organized in a ready state "Crash Cart." During this situation, individual pieces of medical equipment were retrieved from the locked pharmacy and loaded onto a gurney with other medical equipment to be taken to the scene. When responding, Medical staff did not bring the AED, or medications. (At this time, medications are not expected to be taken to a code blue scene.) Several pieces of equipment were in poor condition and no spare equipment was available once medical staff arrived at the scene. The nursing staff spent several minutes trying to locate proper tubing to connect the oxygen to the ambu-bag both in the cell and after arriving at the medical department. While in the cell, a nurse was having difficulty opening up the oxygen tank. The "key" necessary to open the oxygen tank was difficult to find.

> The tip of the tubing needed to connect the oxygen tank to the ambu-bag was broken.

(Id. at 33.) According to the Spiller report, in Cell 114, though the nurse reported breaths were applied and the chest rose after she inserted an oral airway and used the ambu-bag, it appears there was more time until the next breaths were applied than one would have expected. The performance of CPR was not well organized. (Id. ¶ 68.)

Review of training records for nurses Walsh, Woods, and MacLeod reveal little documentation of training relative to nursing. They may have attended more training, but there is no documentation of such in the staff members' records. (Id. ¶ 67.) Kesteloot indicated that she and the CMS physical therapist are licensed CPR instructors and provided some training and that CMS was required to provide CPR training to the staff in 2006. (Id. ¶¶ 19, 20.) The nursing staff is only required to provide Basic Life Support and use of AED if needed and, while an endotracheal tube can be very helpful in maintaining an open airway, there appeared to be no nurse on duty that is certified at the ACLS (Advanced Cardiac Life Support) level on the night Rideout died. ACLS training is required to insert an endotracheal tube. (Id. at 24.) Choate notes that MSP is accredited under the American Correctional Association Standards but not the National Commission of Correction Health Care, a certification required under the agreement with CMS. (Id. ¶ 13.) The December 12, 2006, Nichols report recommended that security staff be trained by medical staff on the best method to support and protect a prisoner's head and neck when cutting the prisoner down from a hanging position and while carrying out CPR. (Id. ¶ 52.)[5]

Choate concludes her statement of facts with the conclusory legal assertion (citing her conclusory statement in her Fourth Amended Complaint, no less) that "Correctional Medical

---

[5] I have concluded that Paragraphs 22, 25, 26, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 70, 73, 74 of this statement of fact are immaterial to Choate's hypothetical summary judgment case apropos CMS.

Services actions and failures to act by failures to train and failures to provide necessary medical supplies were a joint and proximate cause of the death of Ryan Rideout." (Id. ¶ 7[5].)[6]

Judging by her ultra vires statement of fact, Choate is not attempting to prove that prior to her son's suicide there was a pattern of sufficiently similar Eighth Amendment shortfalls at the prison for which CMS was responsible.  I am cognizant that with respect to a "policy and custom" theory of municipal liability that a "'single incident' of misconduct without other evidence, cannot provide the basis for municipal liability under § 1983."  Bordanaro v. McLeod, 871 F.2d 1151, 1161 n.8 (1st Cir. 1989); see also Tuttle, 471 U.S. at 823-24 ("[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.")(footnotes omitted).  There are at least three cases in this District that have stressed this point. See Parlin v. Cumberland County, __ F. Supp. 2d. __, __ 2009 WL 2982762, 7 (D.Me. Sept. 11 2009) ("Plaintiff has presented no evidence showing that other inmates were denied appropriate medical treatment by Jail officials. … Accordingly, Plaintiff has failed to establish a trial-worthy issue as to whether the County had an unconstitutional policy or custom that was the motivating force behind a violation of her civil rights.") (citing Bordanaro v. McLeod, 871 F.2d 1151, 1161 n.8 (1st Cir. 1989));  Buchanan ex rel. Buchanan v. Maine, 417 F.Supp.2d 45, 65 (D. Me. 2006) ("There is simply no evidence that the alleged failure to train constituted a well-settled and

---

[6] Although this is the final statement of fact, Choate closes with the request that the Court: "Please make reference to Plaintiff's Exhibits to Statements of Fact in Opposition to Statements of Material Fact of Defendants Beard, Peters, Robinson and O'Farrell."  Needless to say, I have already bent over backward to address Choate's ultra vires statements of fact in making this recommendation on CMS's motion to dismiss; I do not think a single judge in this district would, under the circumstances of this particular litigation, countenance such a request.

widespread custom or practice; for example, that others had been subjected to illegal entries, that persons with mental illnesses had been subject to improper treatment by the Sheriff's Department, or that any written or unwritten County procedure was defective. Based on this record, this Court cannot even begin the Canton analysis and Mr. Buchanan's attempt to premise County liability on an illegal custom or policy fails for lack of evidence."); Mulkern v. Cumberland County, No. 00-382-P-C, 2001 WL 1519409, *21 (D.Me. Nov. 30, 2001) (recommended decision) adopted (Doc. No. 77) (corporate correctional medical provider could not be held liable on a theory of municipal liability when evidence was limited to a couple of incidents of not providing prescription medications and certain instance of bad record-keeping). And, as definitively distilled in her Fourth Amended Complaint, Choate's claim is by its very dire essence limited to a single response to Rideout, as opposed to a situation in which there was a pattern relating to the care of a particular inmate, see Mracna v. Correctional Medical Services, No. 1:07-cv-1071, 2009 WL 3060423, 2 -3 (W.D.Mich. Sep 22, 2009) ("Plaintiff does allege a pattern of denials of treatment by Defendant CMS for the eye surgery recommended by Plaintiff's treating physician…. Those factual allegations are sufficient to survive a motion to dismiss [after Iqbal].").[7]

Choate's claim against CMS boils down to a failure to train claim, one that includes, as an aspect, an assertion of a failure to properly equip CMS personnel to respond to situations for which they should be properly trained. In Board of County Commissioners v. Brown, the

---

[7] It is clear that Choate's case vis-à-vis CMS does not raise the specter that it, as a final policy making authority, made a singular decision regarding Rideout that amounted to policy determination within the meaning of Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986) and Board of County Commissioners v. Brown, 520 U.S. 397 (1997). See Putnam v. Town of Saugus, 365 F.Supp.2d 151, 178 -83 (D. Mass. 2005)(providing an excellent discussion of this variation of municipal liability).

Supreme Court, addressing an inadequate employment screening claim, cautioned with respect to failure to train claims:

> Claims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof. … We recognized these difficulties in Canton v. Harris, where we considered a claim that inadequate training of shift supervisors at a city jail led to a deprivation of a detainee's constitutional rights. We held that, quite apart from the state of mind required to establish the underlying constitutional violation--in that case, a violation of due process, 489 U.S., at 388-389, n. 8 --a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences. Id., at 388. A showing of simple or even heightened negligence will not suffice.
> 
> We concluded in Canton that an "inadequate training" claim could be the basis for § 1983 liability in "limited circumstances." Id., at 387. We spoke, however, of a deficient training "program," necessarily intended to apply over time to multiple employees. Id., at 390.  Existence of a "program" makes proof of fault and causation at least possible in an inadequate training case. If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action--the 'deliberate indifference' --necessary to trigger municipal liability….[T]he existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury. ") (citing Canton, 489 U.S. at 390-91 & n. 10). See Baron v. Suffolk County Sheriff's Dept., 402 F.3d 225, 239 -40 (1st Cir. 2005).
> ....
> … In leaving open in Canton the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice--namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation--that the

11

> municipality's indifference led directly to the very consequence that was so predictable.

520 U.S. 397, 406-10 (1997); see also Canton, 489 U.S. at 390-91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.") (citing City of Springfield v. Kibbe, 480 U.S. at 268 (O'Conner, J., dissenting in dismissal) and Tuttle, 471 U.S. at 821 (opinion of Renquist, J.)).

There is no question that to impose liability on CMS for the alleged constitutional deprivations of personnel responding to Rideout's hanging that it was responsible for training and equipping, Choate must meet the "deliberate indifference" standard and not a lesser standard of negligence. Brown, 520 U.S. at 406-07; Canton, 489 U.S. at 388-90 & n.8. Even in her summary judgment pleadings Choate does not dispute that CMS had a policy and a training program in place that addressed the need for a responder to know CPR and to respond to Code Blues with a medical cart. This is not a case where there was an utter lack of preparedness -- either in training or equipage -- by CMS vis-à-vis this type of medical crisis, a medical crisis they admittedly would have known to a "moral certainty" that their staff would need to address.

Canton, 489 U.S. at 390 n.10; Natale v. Camden County Corr. Facility, 318 F.3d 575, 583 - 85 (3d Cir. 2003). See cf. Bowen v. City of Manchester, 966 F.2d 13, 18 -19 (1st Cir. 1992) ("Viewed in the best light for appellant, the evidence in this case indicates that the City was negligent, not deliberately indifferent. Although the record demonstrates that the City had no training in suicide prevention, in 1986 the Constitution required the City of Manchester to train its jail personnel to recognize and deal with the obvious medical needs of detainees. There is no evidence here that even if the officers who came into contact with Mr. Bowen had been trained in screening for suicidal detainees, they could have prevented Mr. Bowen's suicide.") (cited source omitted).

Choate presents slim evidence in her proposed statement of facts that CMS personnel on the night shift did not participate in all the required training provided for under the operative agreements/policy. She can muster only that a review of training records for nurses Walsh, Woods, and MacLeod reveal little documentation of training relative to nursing. They may have attended more training, but there is no documentation of such in the staff members' records. On the other hand, it is undisputed that the three medical employees involved in the response were licensed professionals. See, e.g., Languirand v. Hayden, 717 F.2d 220, 229 (5th Cir. 1983) ("Whatever policies the City may have failed to adopt respecting training, there is no showing that any of its officers, other than [one], were not adequately equipped, by training, experience, and ability, to competently perform their jobs.").

I do not credit Choate's argument that Iqbal does not apply at this stage of the litigation. However, in an abundance of caution I have set forth Choate's summary judgment proof even

13

though CMS has not had a chance to contest the factual statements or record citations.[8]  I also note that in reviewing the set of dispositive motions in this case, I have carefully considered the video of the cell entry and resuscitation efforts on the night of Rideout's suicide.  See Scott v. Harris, 550 U.S. 372, 378-80 & ns. 6 &7 (2007). As Choate attempts to prove in her statement of facts, there appears to be difficulty with equipment and there were no visible efforts to stabilize Rideout's neck or manipulate the opening of his airway.  It is also quite clear that the correctional officers and medical personnel involved in the CPR efforts once the medical staff arrived were entirely committed to their efforts of resuscitation. Needless to say, Choate would have to prove that the individuals responding to this incident for which CMS was responsible were themselves deliberately indifferent to Rideout's need for medical care in order to proceed against CMS on a theory of municipal liability.  See Wilson v. Town of Mendon, 294 F.3d 1, 6 - 7 (1st Cir. 2002).  Her statement of fact does not attempt to meet this key burden.   With respect to the efforts of these individuals on the night in question, the medical equipment provided, and the training protocols, at most Choate would prove on her proffered summary judgment record if the court were to deny this motion to dismiss, is negligence, not deliberate indifference, on the part of CMS.

---

[8]     This is not a case in which I would consider allowing Choate to yet again amend her complaint.  The action was commenced on February 15, 2008.  The Fourth Amended complaint was filed on May 29, 2009.  Iqbal was decided on May 18, 2009.  The Iqbal majority provided that the Court of Appeals "should decide in the first instance whether to remand to the District Court so that respondent can seek leave to amend his deficient complaint." 129 S. Ct. at 1954; see Iqbal v. Ashcroft, 574 F.3d 820, 822 (2d Cir. 2009) (remanding to the District Court). Several courts applying Iqbal have allowed plaintiffs to amend claims in the hopes of meeting its stricture. See, e.g. Padilla v. Yoo, 633 F. Supp. 2d 1005, 1040 (N.D.Cal. 2009); Lamon v. Junious, No. 1:09-cv-00484-GSA PC, 2009 W L 3248173, 6  (E.D. Cal. Oct. 8, 2009); Biton v. Cuomo, No. 09-CV-02831 (CBA), 2009 WL 3052650, 3 (E.D.N.Y. Sep. 23, 2009);   Harvey v. City of Fresno, No. 1:08-CV-01399-OWW-DLB, 2009 WL 3157524, 7  (E.D. Cal. Sept. 28, 2009) ; JG & PG ex rel. JGIII v. Card , No. 08 Civ. 5668(KMW), 2009 WL 2986640, 13 (S.D.N.Y. Sept. 17, 2009) (unpublished);  Stamas v. County of Madera, No. CV F 09-0753 LJO SMS, 2009 WL 2513470, 11 (E.D.Cal. Aug. 17, 2009) (unpublished). Shortly before the Fourth Amended complaint I raised the issue of the implications of Iqbal in a May 22, 2009, telephone conference addressing the attempt to file the Fourth Amended complaint.  (See Doc. No. 110.)

**CONCLUSION**

For the reasons stated above, I recommend that the court grant CMS's motion to dismiss.

**NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

October 20, 2009.