UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| BRENDA CHOATE, Personal | ) | |
| Representative of the Estate of | ) | |
| Ryan Rideout, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 08-49-B-W |
| | ) | |
| JEFFREY MERRILL, et al. | ) | |
| | ) | |
| Defendants | ) | |

***Recommended Decision on Motion to Dismiss***
***filed by Defendants Magnusson, Merrill, O'Farrell, and Riley (Doc. No. 118)***
***and on Motion for Summary Judgment filed by O'Farrell (Doc. No. 119)***

Ryan Rideout hung himself at the Maine State Prison on October 5, 2006.  His mother, Brenda Choate has brought a civil rights action on behalf of Rideout's estate.  As the suit has progressed Choate has crystallized her legal theories and the constitutional claims are now narrowed to ones asserting Eighth Amendment deliberate indifference.[1]  Choate's theory vis-à-vis Department of Corrections Commissioner Martin Magnusson, Maine State Prison Warden Jeffrey Merrill, Maine State Prison Deputy Warden James Merrill, and Deputy Warden Nelson Riley[2] is that they are liable as supervisors for their subordinates' failures of response to Rideout's suicide attempt.

With respect to the Fourth Amended Complaint Choate has distilled the factual underpinnings of her Eighth Amendment claim by targeting: one, a delay by Defendant Bobby

---

[1]        Choate has one count under the United States Constitution, 42 U.S.C. § 1983, and one count under the Maine State Constitution.   There is no dispute that these two counts are subject to the same disposition.   See Berube v. Conley, 506 F.3d 79, 85 (1st Cir. 2007).   In addition, Choate has clearly pled her state wrongful death count (and the attendant count for conscious pain and suffering) as tethered to her constitutional claims.   (See Fourth Am. Compl. ¶¶ 38, 39.)

[2]        I use the correct spelling of Riley's name; the docket reflects the incorrect spelling of "Reilly."

Lee Beard in calling Code Blue when he first discovered Rideout hanging; two, evidence that other inmates on Rideout's corridor used their emergency buzzer to notify guards of Rideout's attempt but these buzzer were not properly responded to; and, three, the medical attention given and medical equipment employed was inadequate to save Rideout's life.

Choate has clearly indicated that she is not proceeding with any claims against Defendant Nelson Riley. As a consequence of this concession, the Court should grant judgment in Riley's favor. With respect to Defendants Magnusson and Merrill, I recommend the Court grant the motion to dismiss. And, in view of the fact that O'Farrell and Choate have fully litigated a summary judgment motion, I present the factual record on that motion and recommend that the Court grant O'Farrell summary judgment.

## DISCUSSION

### A. Standards Applicable to the Motion to Dismiss and the Motion for Summary Judgment

#### 1. Deliberate Indifference Standard

In Manarite v. City of Springfield, the First Circuit described the Eighth Amendment deliberate indifference standard for prison suicide cases:

> The Supreme Court has made clear that Section 1983 permits recovery for loss of life (or for serious physical harm) only where the defendant acts intentionally or with an analogous state of mind usually described as "deliberate indifference" to deprivation of the victim's constitutional right. Wilson v. Seiter, 501 U.S. 294 (1991) ("deliberate indifference" standard in Eighth Amendment prison conditions case); Canton v. Harris, 489 U.S. 378, 388-90 (1989) (same in Fourteenth Amendment municipal liability, police denial of medical treatment case); Estelle v. Gamble, 429 U.S. 97, 104-06 (1976) (same in Eighth Amendment prison medical treatment case).
> The Supreme Court has also made clear that, by "deliberate indifference," it means more than ordinary negligence, and probably more than gross negligence. Canton, 489 U.S. at 388 n. 7 ("some [lower] courts have held that a showing of 'gross negligence'" is adequate, "[b]ut the more common rule is ...

'deliberate indifference'" ); <u>Daniels v. Williams</u>, 474 U.S. 327, 328 (1986) (civil rights laws do not permit recovery based on simple negligence).

....

The cases also indicate that, when liability for serious harm or death, including suicide, is at issue, a plaintiff must demonstrate "deliberate indifference" by showing (1) an unusually serious risk of harm (self-inflicted harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk. The risk, the knowledge, and the failure to do the obvious, taken together, must show that the defendant is "deliberately indifferent" to the harm that follows.

957 F.2d 953, 955 -56 (1st Cir. 1992); <u>accord</u> <u>Bowen v. City of Manchester</u>, 966 F.2d 13, 17 (1st Cir. 1992).[3]

### 2. *Supervisor Liability in the Aftermath of <u>Iqbal v. Ashcroft</u>*

Not one of these moving defendants was present at the Maine State Prison on the evening of October 5, 2006. There is no dispute that they are all sued in their supervisory capacities on a theory that they are responsible, in their absence, for the way things unfolded on the night of Rideout's suicide.[4] The <u>Iqbal v. Ashcroft</u> majority explained vis-à-vis supervisory liability:

---

[3]     The United States Supreme Court's <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994) made clear that to demonstrate recklessness sufficient to hold a defendant liable under the Eighth Amendment, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837. Thus, the <u>Manarite</u> test is consistent with <u>Farmer</u> and continues to be useful for correctional institution suicide cases because of its tailored analysis. <u>See also</u> <u>Pelletier v. Magnusson</u>, 201 F. Supp. 2d 148, 162-65 (D. Me. 2002). <u>Farmer</u> cited <u>Manarite</u> as one of the Circuit level cases requiring a showing of recklessness, as opposed to mere negligence. 511 U.S. at 836.

[4]     In their motion to dismiss the defendants make a distinction between the claims against O'Farrell relating to his supervisory conduct and those relating to his direct conduct. (Mot. Dismiss at 1-2.) They cite Paragraph 10 of the Fourth Amended Complaint as the paragraph targeting O'Farrell for his direct conduct. (<u>Id.</u> at 2 n.2.) That paragraph is set forth below in the context of my discussion of the motion to dismiss. It is because of this distinction that O'Farrell has also filed a motion for summary judgment on this notion of a "direct conduct" liability.

In my order of May 26, 2009, I did "note that O'Farrell appears to be sued for both direct and supervisory conduct, at least under my understanding of the complaint." (May 26, 2009, Order at 7, Doc. No. 112.) Now having digested <u>Iqbal v. Ashcroft</u>, __ U.S. __, __, 129 S.Ct. 1937 (May 18, 2009) a little more, and having the benefit of the O'Farrell summary judgment record before me, it is clear that there was no in-house involvement by O'Farrell in the decisions made apropos Rideout on October 5, 2006, and that his liability is limited to any <u>direct</u> <u>supervisory</u> involvement in the asserted Eighth Amendment violation.

Although, in hindsight, it may not have been necessary for O'Farrell to file a separate motion for summary judgment, it turns out to be just as well that he did so. This is because a review of the summary judgment record, as opposed to focusing only on the allegations of the complaint, resolves any ambiguity as to the strength of Choate's case regarding O'Farrell.

"Based on the rules our precedents establish, respondent correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." __ U.S. __, __, 129 S.Ct. 1937, 1948 (May 18, 2009) (Kennedy, J., delivered the opinion of the Court, in which Roberts, C.J., and Scalia, Thomas, and Alito, JJ., joined)(citing  Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691 (1978), Dunlop v. Munroe, 7 Cranch 242, 269, 3 L.Ed. 329 (1812), Robertson v. Sichel, 127 U.S. 507, 515-516  (1888)).   "Because vicarious liability is inapplicable to Bivens and § 1983 suits," the majority proceeded, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id.

The majority rejected Iqbal's argument with respect to an equal protection claim that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," id. at 1949, expanding:

> Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents. In a § 1983 suit or a Bivens action-where masters do not answer for the torts of their servants-the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose Bivens liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

Id.

The Iqbal Souter dissent[5] reads the implications of the majority reasoning in stark terms, opining:

---

[5]       Justice Breyer penned a separate dissent on the issue of qualified immunity and the potential for proper case management in cases that survive a motion to dismiss.  Id. at 1961-62 (Breyer, J., dissenting).

> According to the majority, because Iqbal concededly cannot recover on a theory of respondeat superior, it follows that he cannot recover under any theory of supervisory liability. … Lest there be any mistake, in these words the majority is not narrowing the scope of supervisory liability; it is eliminating Bivens[6] supervisory liability entirely. The nature of a supervisory liability theory is that the supervisor may be liable, under certain conditions, for the wrongdoing of his subordinates, and it is this very principle that the majority rejects.

Id. at 1957 -58 (Justice Souter, dissenting, joined by Justice Stevens, Justice Ginsburg, and Justice Breyer).[7]

Prior to Iqbal (and the Souter dissent's obituary of supervisory liability) the First Circuit summarized the distinction between theories of supervisory liability and respondeat superior as follows:

> Supervisors may only be held liable under § 1983 on the basis of their own acts or omissions. [Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 48 (1st Cir.1999)]. Supervisory liability can be grounded on either the supervisor's direct participation in the unconstitutional conduct, or through conduct that amounts to condonation or tacit authorization. See Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir.1999). Absent direct participation, a supervisor may only be held liable where "(1) the behavior of [his] subordinates results in a constitutional violation and (2) the [supervisor's] action or inaction was ' affirmatively link [ed] ' to the behavior in the sense that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence ... amounting to deliberate indifference.' " Hegarty v. Somerset County, 53 F.3d 1367, 1379-80 (1st Cir.1995) (quoting Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 902-03 (1st Cir.1988)).

---

[6]    Although not stressed by Justice Souter, the majority made clear in the passage quoted above that its statements on this score applied to § 1983 actions as well as Bivens suits.

[7]    This dissenting opinion opened with the following salvo:

> This case is here on the uncontested assumption that Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), allows personal liability based on a federal officer's violation of an individual's rights under the First and Fifth Amendments, and it comes to us with the explicit concession of petitioners Ashcroft and Mueller that an officer may be subject to Bivens liability as a supervisor on grounds other than respondeat superior. The Court apparently rejects this concession and, although it has no bearing on the majority's resolution of this case, does away with supervisory liability under Bivens. The majority then misapplies the pleading standard under Bell Atlantic Corp. v. Twombly, 550 U.S. 544  (2007), to conclude that the complaint fails to state a claim. I respectfully dissent from both the rejection of supervisory liability as a cognizable claim in the face of petitioners' concession, and from the holding that the complaint fails to satisfy Rule 8(a)(2) of the Federal Rules of Civil Procedure.

Id. at 1954 -55.

Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005). The Iqbal Souter dissent cited Whitfield as an example of a Circuit Court of Appeals opinion that provided that, even if "an employer is not liable for the actions of his employee solely because the employee was acting within the scope of employment, there still might be conditions to render a supervisor liable for conduct of his subordinate." Iqbal, 129 S. Ct. at 1958.   This dissent certainly seems to be implying that Whitefield is no longer good law under the majority's opinion.

      Given that the Iqbal majority pressed ahead with its supervisory liability discussion, over a strong dissent on this particular issue, there is reason to conclude that a showing that the following standards associated with Circuit Court of Appeals cases are not sufficient to proceed with a claim against a supervisor: if the defendant "knowingly acquiesced" or allegations that the supervisor at least had knowledge of and was deliberately indifferent to the constitutional violation, Iqbal, 129 S. Ct. at 1957 (Souter, J., dissenting); id. at 1958;  if the defendant knew about the conduct and facilitated, approved, condoned, or turned a blind eye to it, id. (quoting International Action Center v. United States, 365 F.3d 20, 28 (D.C. Cir. 2004) (Roberts, J.), in turn quoting Jones v. Chicago, 856 F.2d 985, 992 (7th Cir. 1988) (Posner, J.));  if the defendant was "reckless in his supervision of the subordinate," id.; or if the defendant exhibited gross negligence, id. (quoting Lipsett v. University of Puerto Rico, 864 F.2d 881, 902 (1st Cir. 1988)). These theories of supervisory liability are not enough in the majority's view.  See also Bayer v. Monroe County Children and Youth Serv., 577 F.3d 186, 191 n.5 (3d Cir. 2009) ("In light of the Supreme Court's recent decision in Ashcroft v. Iqbal, 129 S.Ct. 1937 (May 18, 2009), it is uncertain whether proof of such personal knowledge, with nothing more, would provide a sufficient basis for holding [a supervisor] liable with respect to plaintiffs' Fourteenth Amendment claims under § 1983.").

That said, in the First Circuit, the verdict is not in as to whether the concept of supervisory liability survives Iqbal.   See Santana-Castro v. Toledo-Davila, 579 F.3d 109, 116 n.5  (1st Cir. 2009);  Maldonado v. Fontanes, 568 F.3d 263, 274 -75 & n.7 (1st Cir. 2009).[8] However, the First Circuit explained in Maldonado, issued after Iqbal, that, at best from a plaintiff's perspective:

> [S]upervisory liability lies only where an " 'affirmative link' between the behavior of a subordinate and the action or inaction of his supervisor" exists such that " 'the supervisor's conduct led inexorably to the constitutional violation.' " Pineda, 533 F.3d at 54 (quoting Hegarty v. Somerset County, 53 F.3d 1367, 1380 (1st Cir.1995)).
> Further, supervisory liability under a theory of deliberate indifference "will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." Id. (quoting Hegarty, 53 F.3d at 1380) (internal quotation marks omitted).

568 F.3d at  274 -75; see al-Kidd v. Ashcroft,  580 F.3d 549, __, (9th Cir.  2009) ("knowing failure to act in the light of even unauthorized" constitutional violations can form the basis for supervisory liability after Iqbal.); Gilley v. Ryan, No. 09-22130-CIV, 2009 WL 2929418, 2 (S.D.Fla. Sept. 9, 2009) (suggesting that after Iqbal, "a plaintiff must demonstrate either that the defendant directly participated in the alleged constitutional deprivation or that there is some other causal connection between the official's acts or omissions and the alleged constitutional deprivation") (emphasis added).

### B.  Motion to Dismiss

Per Iqbal, I identify the conclusory allegations of the Fourth Amended Complaint which are not entitled to the assumption of truth.  Id. at 1949.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Bell

---

[8]     See also Brickell v. Clinton County Prison Bd., __ F. Supp. 2d __, __, 2009 WL 2957788, 3 -5 (M.D.Pa. Sept. 10, 2009); but see Diaz-Martinez v. Miami-Dade County, No. 07-20914-CIV, 2009 WL 2970468, 14 -15 (S.D.Fla. 2009).

Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Next, to the extent that Choate has pled

factual allegations that go beyond conclusions, I must credit them and measure whether they

plausibly give rise to an entitlement to relief. Id. at 1950.  "Determining whether a complaint

contains sufficient facts to state a plausible claim for relief will ... be a context-specific task that

requires" this court "to draw on its judicial experience and common sense." Id.  "[W]here the

well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

the complaint has alleged-but it has not 'show[n]'" that Choate "'is entitled to relief.'" Id. (quoting

Fed. R. Civ. P. 8(a)(2)).

   The complaint allegations that Choate identifies as key to her Federal Rule of Civil

Procedure 12(b)(6) pleadings against these supervisory defendants are as follows:

> 10.   The Defendant, James O'Farrell, was at all times material hereto, the
> Deputy Warden, Chief of Security, Supervisor of the Special Management Unit of
> the Department of Corrections, and was the Supervisor who assigned the guards
> of the POD where Inmate Ryan Rideout was housed, trained the personnel, and
> established policies for the extraction of inmates from their cells, and who
> supervised the Extraction Team, set their personnel, established procedure and
> ultimately supervised the Medical Team who were on duty the night that Rideout
> died.

> 15.   On October 5, 2006, at approximately 11:35 P.M., a medical team
> composed of employees of Maine State Prison came down the corridor with a
> stretcher, two sergeants, followed by a Captain. The medical cart, for furnishing
> of which Defendant CMS was responsible, was inadequately furnished to salvage
> the life of a person who had attempted suicide, including failure to have the
> defibrillator on it, and a breathing tube. Nor was a key to the oxygen tank
> available.

> 26.   The Defendants, Jeffrey Merrill, Martin Magnusson and Nelson Reilly,
> jointly, severally, and individually, and in their representative capacity maintained
> a policy or custom of deliberate indifference to the provision of life saving
> equipment, enforcement of the emergency buzzer system, and training in life
> saving techniques by guards, which allowed warning of suicides, or suicide
> attempts.

28.     The Defendants, Martin Magnusson, Jeffrey Merrill and Nelson Reilly, acted with deliberate indifference to the Constitutional rights of the inmates in the Special Management Unit by failing to take adequate steps to discipline, supervise and train Defendants Robert Beard, Michael Peters, James O'Farrell and other workers to ensure the safety of its inmates.

29.     Defendants Commissioner Martin Magnusson, Warden Jeffrey Merrill, Deputy Warden James O'Farrell and Deputy Warden Reilly, acquiesced and knew that neglect and misconduct by Guards and other employees or agencies including CMS towards the inmates in the Special Management Unit, of the same kind that ultimately resulted in Rideout's death, would not result in sanction by their employer.

31.     The Defendants Merrill, Magnusson, Reilly, and O'Farrell, who were in a supervisory capacity, jointly, severally, individually, and in their Representative capacities, and as employees of the State, knew, had reason to know, and were placed on actual notice of Ryan Rideout's high and extreme need to be watched so he did not kill himself; knew or had reason to know and were placed on actual notice that the alarm systems in the prisoner's individual cells could be turned off in "control" by correction officers, creating a situation where response to suicide attempts was severely hindered; knew or had reason to know and were placed on actual notice that because some of the inmates could ring the alarm unnecessarily such alarms were routinely often turned off or ignored by guards.

32.      Leaving Ryan Rideout in the cell in which he was placed on the night of his suicide, under these above circumstances, exhibited deliberate indifference to and reckless disregard for Ryan Rideout's safety, and was the direct and proximate cause of the Ryan Rideout's death.

(4th Am. Compl. ¶¶ 10, 15, 26, 28, 29, 31, 32.)  Paragraphs 32 and the first part of Paragraph 31 are residues of Choate's abandoned theory that staff at the prison did not adequately attend to Rideout's pre-suicide mental health needs.  (See May 26, 2009, Order at 3, Doc. No. 112, see also Stip. Dismissal at 1, Doc. No. 95.)

It seems to me that these paragraphs fall easily within the characterization in Iqbal and Twombly of "formulaic recitation of the elements" of the constitutional claim, in this case deliberate indifference and/or failure to train by a supervisor.  See Iqbal, 129 S. Ct. at 1951.  As in Iqbal, the allegations are not "unrealistic or nonsensical" or "extravagantly fanciful" but they

9

are "bald" and "conclusory", id., with respect to creating an affirmative factual link between Defendants Magnusson, Merrill, and O'Farrell to the October 5, 2006, response by correctional staff and the medical team to Rideout's hanging.[9]  See  Padgett v. Arpaio, No. CV 07-1979-PHX-MHM (MEA), 2009 WL 2590119, 6 (D.Ariz. Aug. 21, 2009) ("Here, there are no allegations of direct involvement by Defendant nor is there evidence of any policies at the jail that allowed inmates to be exposed to excessive heat or, for that matter, to overcrowding. Plaintiff merely presents conclusory allegations that Defendant "knows and approves of" and "enforces" the policies at the jail."); Cooper v. Ferrell, Civ. No. 08-0321-CG-C, 2009 WL 2762783, 1 -2 (S.D. Ala. Aug. 27, 2009) (adopted recommended decision) ("Here, plaintiff has simply alleged that Brown 'failed to give plaintiff proper training by ADOC staff members.' This is an unadorned accusation with no facts provided to support it and to allow the Court to draw the conclusion that certain unidentified acts indicate that Brown failed to provide training to plaintiff by ADOC staff.  Plaintiff's claim is, therefore, not plausible. He has only alleged a possibility, which is insufficient for stating a claim.") (record and citations to Iqbal omitted).

        With regards to her argument in her consolidated response to the multiple dispositive motions, Choate maintains that defendants O'Farrell, Warden Merrill, and, "to a slightly lesser extent," Commissioner Magnusson, are directly involved in hands on administration of the prison and each was involved in the investigation of Rideout's death.  (Consolidated Resp. at 3-

_____

[9]        Choate argues that Iqbal is inapplicable here because discovery is complete.  (Consolidated Rep. at 2.) First, Choate was allowed to amend her complaint this final time with the express proviso that the defendants would be allowed to do further discovery with respect to expert designation necessary to defend the new Eighth Amendment theory should claims survive this first round of dispositive motions.  Second, Choate is wrong that Iqbal somehow goes by the wayside once discovery has been completed.  Furthermore, Iqbal noted "the question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls placed on the discovery process." 129 S. Ct. at 1953. And, these defendants have, in answering an earlier version of Choate's complaint, asserted qualified immunity and I consider that defense preserved.  Iqbal also stressed that a defendant's assertion of this immunity defense means that a court must "give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties." Id. at 1954; see also id. at 1953-54.

4.) [10] She opines: "There is a direct link between the supervisors and the violations. If these matters addressed do not come to the attention of the Defendants Magnusson, Merrill, O'Farrell, essentially no one is responsible." (Id. at 5 n.3.)   Choate argues that "the facts resulting in Rideout's death reflect not a unique single instance failure, but a failure of policy whereby prisoners are permitted routinely to undermine the system because they are never disciplined for abuse of the buzzer system." (Id. at 6.)  She describes Magnusson, Merrill and O'Farrell as being "where the buck stops" and contends that they still "have not implemented Medical care recommendations and … the Maine State Prison is still not accredited by NCCHC. " (Id. at 10.)

> Choate's final parry as to these defendants' supervisory liability is:
>
> On the pleadings and extrinsic evidence presented, one cannot conclude that an objective official in any of the respective Defendant's positions, as a matter of law, would have reasonably concluded that their respective actions and omissions in implementing and executing the buzzer policy, the policy on CPR, the policy on provision of life saving equipment (all to a greater or lesser extent corroborated by subsequent failures to correct), was not a violation of the constitutional right of Plaintiff's decedent, Ryan Rideout, to life, to safety and reasonable treatment.

(Id. at 20.)[11]

In the wake of Iqbal this complaint clearly fails to allege a sufficiently affirmative link between Magnusson and Merrill's conduct and the events on the night of Rideout's suicide.  See

---

[10]     The response in the aftermath of the suicide is highlighted multiple times by Choate.  For instance, she complains that the officer responding to the hanging, Defendant Beard, was only fired for lying on his report and not for his dilatory reaction upon discovery of Rideout's attempt, opining that this firing rationale "is emblematic of deliberate indifference to prisoners' constitutional rights. Deputy O'Farrell who participated directly in the investigation of Rideout's death, and Warden Merrill and Commissioner Magnusson, who received the reports, ignored the failure to enforce buzzer policies, and gave no evidence that the failure gave concern." (Consolidated Resp. at 8-9.)

[11]     In responding to the motion to dismiss, Choate relies heavily on her statements of fact submitted in response to the motion to dismiss filed by Correctional Medical Services and the motion for summary judgment filed by O'Farrell.  But this motion is framed solely as a motion to dismiss tethered to the allegations of the Fourth Amended Complaint.

e.g., al-Kidd, 580 F.3d at __, 2009 W L 2836448 at 25.[12]  "Rule 8 does not empower [Choate] to

plead the bare elements of [her] cause of action, affix the label 'general allegation,' and expect

[her] complaint to survive a motion to dismiss."  Iqbal, 129 S.Ct at 1954.   Indeed, Choate's most

persistent refrain about Merrill and Magnusson is that they were involved in the post-

constitutional-violation investigation of the Rideout suicide and that they have not since

adequately responded to the issues raised by that investigation.  There is no doubt that this after-

the-fact investigation is not enough  standing alone to attach liability to these two defendants for

a single constitutional injury of October 5, 2006, when Rideout was pronounced dead.  See, e.g.,

Lamon v. Junious, No. 1:09-cv-00484-GSA PC, 2009 W L 3248173, 4 -5 (E.D. Cal. Oct. 8,

2009).

        In reaching this conclusion I stress that this motion to dismiss as it pertains to Magnusson

and Merrill is not a particularly hard call after Iqbal.  Even assuming that on the right allegations

supervisory liability can be pled after Iqbal based on circumstantial evidence that the defendant

supervisor could not help but know of a continuing pattern of Eighth Amendment violation by

his or her subordinate, see Chao v. Ballista, 630 F. Supp. 2d 170, 177-78 (D. Mass. 2009) (post-

Iqbal case concluding that the plaintiff had stated a supervisory liability claim when the

subordinate engaged in between 50 to 100 incidents of sexual contact with the plaintiff over the

course of a year, there were rumors floating around the facility about the subordinate's activities

resulting in an ineffective reassignment of the perpetrator, there was a conscious acquiescence to

allowing the subordinate to access the plaintiff during certain hours, the subordinate had sexual

relationship with at least one other female inmate, and medical staff put plaintiff on an oral

---

[12]    The Ninth Circuit drew an important distinction between al-Kidd's 18 U.S.C. § 3144 (federal material
witness statute) claim and his conditions of confinement claim as it pertained to the supervisory liability of Ashcroft.

contraceptive during the period),[13] Choate does not have factual allegations to support such a

theory of liability.  Her allegations relate to this single episode and the inadequacy of the

response by the correctional medical staff.   There are no allegations (nor do Choate's summary

judgment facts pertaining to CMS and the other defendants support) that there had been similar

prior incidents where there was inadequate response by correctional or medical staff resulting in

injury to an inmate relative to the response to the emergency buzzers, the timely calling of Code

Blue, or the provision of post-discovery medical care/equipage.

And if push came to shove, the complaint probably could also be dismissed for failure to

state a claim against O'Farrell.   However, I address the merits of the pending motion for

summary judgment below as the parties have presented their evidentiary basis in support and in

defense of that motion. That is, Choate and O'Farrell have had a chance to lay their evidentiary

cards on the table.[14]

### C.  <u>O'Farrell Motion for Summary Judgment</u>

### 1.  *Summary Judgment Standard*

"At the summary judgment stage," the United States Supreme Court explained in <u>Scott v.

Harris</u>, "facts must be viewed in the light most favorable to the nonmoving party only if there is a

---

13        District Court Judge Gertner observed in <u>Chao</u>:
          Notably, the state of mind required to make out a supervisory claim under the Eighth
          Amendment-i.e., deliberate indifference-requires less than the discriminatory purpose or intent
          that Iqbal was required to allege in his suit against Ashcroft and Mueller. See <u>Ashcroft v. Iqbal</u>,,
          __ U.S. __, 129 S.Ct. 1937, 1951-52 (2009). Together with the other contextual factors discussed
          above, what qualifies as a fair or credible inference from the facts alleged in the pleadings must be
          calibrated accordingly.
<u>Id.</u> at 178 n. 2.

14        <u>See al-Kidd</u>, 580 F. 3d at __, 2009 W L 2836448 at 22 ("Were this case before us on summary judgment,
and were the facts pled in the complaint the only ones in the record, our decision might well be different. In the
district court, moving forward, al-Kidd will bear a significant burden to show that the Attorney General himself was
personally involved in a policy or practice of alleged violations of § 3144. But <u>Twombly</u> and <u>Iqbal</u> do not require
that the complaint include all facts necessary to carry the plaintiff's burden. 'Asking for plausible grounds to infer'
the existence of a claim for relief 'does not impose a probability requirement at the pleading stage; it simply calls for
enough fact to raise a reasonable expectation that discovery will reveal evidence' to prove that claim. <u>Twombly</u>, 550
U.S. at 556.").

'genuine' dispute as to those facts." 550 U.S. 372, 380 (2007) (citing Federal Rule of Civil Procedure 56(c)). <u>Scott</u> reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" <u>Id.</u> (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.'" <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Id.</u>

### 2. *Factual Presentations*

#### a.  O'Farrell's facts

James O'Farrell is the Deputy Warden for Security at the Maine State Prison and has been since July of 2002. (SMF ¶ 1; Resp. SMF ¶ 1.)  In this position, he generally oversees security for the prison. (SMF ¶ 2; Resp. SMF ¶ 2.) O'Farrell insists that he is not and has never been the "Supervisor of the Special Management Unit" at the Prison (SMF ¶ 3;  O'Farrell Aff. ¶ 3); he did not assign the guards of the "POD" where Ryan Rideout was housed, nor did he train them (SMF ¶ 4; O'Farrell Aff. ¶ 4); and he did not supervise, train, set the personnel of, or establish policies or procedures for any extraction team that dealt with Rideout. (SMF ¶ 5; O'Farrell Aff. ¶ 5.)

14

There is no dispute that O'Farrell does not and never has supervised prison medical personnel. (SMF ¶ 6; Resp. SMF ¶ 6.)   He did not in any way supervise the medical team on duty the night that Rideout died.  (SMF ¶ 6; Resp. SMF ¶ 7.) He was not at the prison at any time during the time period beginning several hours before Rideout is alleged to have taken the first steps to hang himself (approximately 11:00 p.m. on October 5, 2006) and ending until sometime after Rideout was taken to Penobscot Bay Medical Center. (SMF ¶ 8; Resp. SMF ¶ 8.)

**b.     Choate's facts**

During the period of 2003 to 2008, Ira Scherr was a union representative, unit chair and, as of 2007 (after the events in question), senior representative of over 700 correctional officers. (SAMF ¶ 2; Scherr  Aff.  ¶ 2; Resp. SAMF ¶ 2.) [15] As Unit Chair for the Union, Scherr attended labor management meetings with management staff at the prison from the winter of 2006 on; O'Farrell, as Deputy Warden of Security, attended almost every meeting. (SAMF ¶¶ 2,3;  Scherr Aff.  ¶ 3;  Resp. SAMF ¶ 3.)

According to Scherr, O'Farrell is the person in management of the Maine State Prison, through whom every policy or procedure (Scherr saw) during two years went through, and they existed or were adopted by his approval.  He would sign off, to the best of Scherr's knowledge, on every policy, and he would often sign for the Warden as designee. ( SAMF ¶ 4; Scherr Aff. ¶ 6.) [16]  After review by O'Farrell, all policies and procedures are generally rubber stamped by Warden Merrill. (SAMF ¶ 6; Scherr Aff. ¶ 10.)

Choate relies on four paragraphs of the affidavit of Scherr:

---

[15]      O'Farrell initially objected that the Scherr affidavit is not cognizable record support given the lack of date and notarization but that deficiency has since been cured.

[16]      O'Farrell denies this by asserting that the Scherr affidavit is not cognizable record support given the lack of date and notarization, a deficiency since cured.

I am personally informed by guards that even today it is common knowledge that and in fact James O'Farrell Sr. oversaw and oversees all policies, procedures, protocols, and approved and approves training for the SMU. It is common knowledge that each person at the prison operates under vicarious liability and supervisors are responsible for those working under them. This is taught by Captain David George or a designee to every person coming through in training.

(Scherr Aff. ¶5.)

Although Deputy James O'Farrell Sr. did not assign guards their individual positions, within his capacity as Deputy Warden for Security, James O'Farrell Sr. saw every schedule as to where Guards were assigned every day and a copy of every schedule provided to him came through his office for his review.

(Id. ¶ 11.)

All Special Management Unit ("SMU") Policies and Procedures went through Unit Manager Doug Starbird to Deputy Warden James O'Farrell Sr. who exercised final authority, followed by the warden.

(Id. ¶ 7; SAMF ¶ 7.)

Deputy James O'Farrell Sr. is responsible to approve how extraction teams operate and they have to have his approval. Deputy O'Farrell had responsibility for any extraction team that dealt with Ryan Rideout.

(Id. at 12; SAMF ¶ 12.)

The SMU is on its own radio channel frequency.  O'Farrell, as Chief of Security has a radio that can be tuned to the SMU frequency.  At times O'Farrell tunes into the SMU Frequency and has responded in a supervisory manner when he has heard things going on in the SMU.

(SAMF ¶ 8; Scherr Aff. ¶ 16; Resp. SAMF ¶ 8.)

Per, Scherr, discipline of prisoners in the SMU is often not enforced creating a hazard for individual prisoners.   (SAMF ¶ 9; Scherr Aff.  ¶18.)  Application of prison policy is inconsistent depending on who the commanding officer is at any particular time.  Scherr believes that

O'Farrell sits in his office and watches monitors almost all day long. (SAMF ¶ 10; Scherr Aff. ¶ 22;  Resp. SAMF ¶ 10.)

O'Farrell denies that there are any documents respecting a policy regarding the emergency call buttons from cells in the SMU. (SAMF ¶ 13; Resp. SAMF ¶ 13.)    According to Officer Beard, O'Farrell was at meetings on three or four occasions (prior to Rideout's death) where abuse of the emergency button procedure was discussed. (SAMF ¶ 15; Resp. SAMF ¶ 15.)

O'Farrell participated in the review of Officer Bobby Lee Beard's conduct relating to the death of Ryan Rideout on October 5, 2006.  (SAMF ¶ 11; Resp. SAMF ¶ 11.)  O'Farrell concluded that Beard had left Rideout hanging for a period of time before he called Code Blue. (SAMF ¶ 12; Resp. SAMF ¶ 12; Nov. 28, 2006, Report at 2, Doc. No. 143-6.)

Matthieus O'Rourke, an inmate present in SMU during Rideout's suicide, drew a diagram of the bottom corridor of B-Wing, SMU, describing the control tower which provided an aerial view of both the top and bottom tiers of the SMU, B-Side. (SAMF ¶ 16; Resp. SAMF ¶ 16.)   B-Wing has lighting in the corridor and in the cells one-hundred-percent of the time, with the cells having enough light to read. (SAMF ¶ 17; Resp. SAMF ¶ 17.)  O'Rourke identified and drew on Deposition Exhibit # 1, the approximately 15 intercoms within the entire bottom tier of the SMU, B-Side, which are two-way intercoms... they (sic) are also two-way microphones so the prisoners can communicate with the tower via these circles and vice versa and you can hear them just as easily. (SAMF ¶ 18; Resp. SAMF ¶ 18.)  O'Rourke also explained the "Buzzer System" as: "If I was to hit my button in my room, the control tower would activate the corridor intercoms, so it would light up the–they would be able to hear the entire corridor."  (SAMF ¶ 19; Resp. SAMF ¶ 19.) The buzzer system attached to these intercom systems, "...that goes to the control room to notify an officer of an emergency first and foremost of a need that we may

17

need...but for the most part people don't use them unless there is an actual emergency, they're utilized the most when people cut up or try to harm themselves in any way or if they need help in their cells for a medical issue. (SAMF ¶ 20; Resp. SAMF ¶ 20.)

There is in fact an emergency call button "housing rule" in the <u>Prisoner's Handbook</u> that states: "Prisoners are not to press call buttons when in their cells.  Cell call buttons are for medical emergencies only."  (SAMF ¶ 14; Resp. SAMF ¶ 14; SMU Rules at 15, Doc. No. 143-11 at 2; SAMF ¶ 21; Resp. SAMF ¶ 21.) The Special Management Housing Rules contains a *caveat* that: "Call buttons, intercoms are to be used to request staff assistance during an emergency. Misuse will lead to disciplinary action."  (SAMF ¶ 22; Resp. SAMF ¶ 22.) Defendant Officer Beard stated during his deposition that the administration solely had the power to punish the inmates for misconduct, and although there was daily abuse of the button procedure and inmates were never punished or sanctioned for the abuse of the buzzer system. (SAMF ¶ 23; Resp. SAMF ¶ 23.)

According to one inmate, Joseph Bradley, there were at least six inmates who were hitting buzzers as early as 20 minutes before Rideout hung himself.  (SAMF ¶¶ 24, 25; Bradley Dep. at 23-26.)[17] Another inmate, Matthieus O'Rourke, stated that he overheard Rideout talking to Joseph Bradley and Rodriguez saying to them: "I'm going to take my sheet and hang myself above my sink, but I don't want–I'm going to make it loose so I won't get hurt, I just want them to think that I'm trying to kill myself so they will take me out of here and put me in the mental health ward, " and he said "I want you to make sure to bang and make a lot of noise as soon as

---

[17]     O'Farrell correctly points out that the actual page of the Bradley Deposition cited by Choate does not support her statements of additional fact.  I have rephrased and limited them while allowing the portions supported by the cited testimony in context.

you see me up there and come down–so the officers come down and see me so I'm not up there

and nothing happens to me."  (SAMF ¶ 27; Resp. SAMF ¶ 27; O'Rourke Dep. at 27.)[18]

James Mac Thomas, a social worker, did not think Rideout suicidal on October 22, 2006.

(SAMF ¶ 28; Resp. SAMF ¶ 28.) [19]

Within hours of Rideout's suicide, Officer Donielle Wilson, who was in the Control

Tower, could not remember which cell Rideout was in. She indicated in her account that he was

in Cell 113 rather than Cell 114. (SAMF ¶ 32; Resp. SAMF ¶ 32; Wilson Interview Rep. at 1,

Doc. No. 146-3.)[20]

### 3.   *Recommendation on O'Farrell motion for summary judgment*

Even on a full summary judgment record –as opposed to the complaint allegations –

Choate's case against O'Farrell is threadbare.  Principally, with respect to O'Farrell's liability,

---

[18]     It is unclear to me why Choate relies on hearsay reports of this conversation when she also has relied on
Bradley's deposition and Rodriguez's affidavit in support of other statements.

[19]     Choate contends that there existed at the time of Rideout's hanging, " . . . a practice of ignoring a prisoner's
threat/attempt of suicide based on the belief that the prisoner is only trying to gain attention ..."  (SAMF ¶ 29; Dec.
12, 2006, Nichols Mem. at 2, Doc. 143-7.)  As O'Farrell points out, the findings section of that memorandum
expressly stated: "We were <u>not</u> able to verify that this practice actually exists but felt we could not simply dismiss
the possibility." (Dec. 12, 2006,  Nichols Mem. at 2.)  It further adds: "Clearly this would be in violation of policy
and training that the staff has received."  (<u>Id.</u>)  I also strike Statement of Additional Fact ¶ 29  because the record
citation is to the index page of the O'Rourke deposition and Statement of Additional Fact ¶ 30 because there is no
support for the proposition in the cited exhibit.

[20]     Choate maintains that  Sgt. Paul St. Pierre told inmate Joseph Bradley that the emergency buzzers are shut
off at times  "...because inmates get us going by pushing their buttons, and it just 'pisses' us off so we shut them off"
(SAMF ¶ 26; Bradley Dep. at 30.)  O'Farrell objects on hearsay ground.  (Resp. SAMF ¶ 26.) The fact does not
actually forward Choate's claim against O'Farrell given the absence of other evidence that there was some concern
that the buzzers were being used not only to irritate guards but also to alert them to actual medical emergencies.

        I strike Statement of Additional Fact ¶ 34 because it is a legal conclusion and not a factual statement.
Further I note that Choate has promulgated the fact that Ursual Charlie Charlton said she writes to the Warden
regularly. (SAMF ¶ 33; Resp. SAMF ¶ 33.) The cited deposition is not in the record, and although O'Farrell does
not contest the fact it is an entirely random paragraph in the context of this summary judgment <u>record</u> and Choate
does not even explain who Charlton is in her memorandum.

        I have also excluded Choate's  assertions vis-à-vis the State's willingness to pay for Officer Beard's
defense. According to Choate, the pertinent portions of the agreement regarding the defense of Bobby Lee Beard
states: "Mr. Bischoff is not to represent clients who may be adverse to the Department of Corrections or its
employees during the period of time he provides representation pursuant to this authorization." (SAMF ¶ 31; Resp.
SAMF ¶ 31."  As O'Farrell points out, this bars Attorney Bischoff's representation of clients other than Beard.   It
does not raise a tenable issue with respect to a conflict of interest between any of the parties to this case.

Choate has generated evidence that there was a problem at the prison with the abuse of the buzzer system by inmates prior to Rideout's suicide and that O'Farrell may have been present at as many as four meetings on this issue prior to the Rideout incident.  She has not presented any evidence that there was a pattern of inmates using the buzzers properly to alert guards to emergencies and having the buzzers ignored to the detriment of the welfare of an inmate or inmates.  There is no record evidence that this latter type danger was explored at the meetings described by Scherr.  Inmate O'Rourke represents that the buttons are utilized the most when people cut up or try to harm themselves in any way or if they need help in their cells for a medical issue.  However, there is no record evidence from which to infer that O'Farrell had reason to know before Rideout's suicide that there was a problem with guards ignoring emergency buzzers that were used for actual emergencies, the disregard of which led to harm to an inmate.   With respect to the official policy concerning buzzers, Choate has only introduced evidence concerning the SMU Rule that prohibited misuse yet allowed for the use of buzzers in emergencies.  To the extent that O'Farrell had any responsibility for that rule it supports his case and not Choate's.

There is no evidence that O'Farrell (or Magnusson or Merrill) made any particular statements about the buzzer system or the medical response to suicide attempts (or other endangerments) that affirmatively links supervisors to the alleged inadequacies of response on the night of the Rideout suicide.  See al-Kidd, 530 F. 3d at __, 2009 W L 2836448 at 22.  There is no evidence that O'Farrell "purposely instructed" his "subordinates to bypass the plain reading of the" prison policies on responding to buzzers or to desist from calling immediate Code Blues when a prisoner is first discovered hanging.  Id..   There is no evidence that because of public

attention or official responses to previous suicide attempts O'Farrell had "sufficient notice to require affirmative acts to supervise and correct the actions of his subordinates." Id. at 23.

With respect to the other two areas identified by Choate as illustrative of O'Farrell's deliberate indifference as a supervisor, the record is devoid of any affirmative link between O'Farrell as supervisor and the identified shortcomings.  I reiterate that O'Farrell was not at the prison at the time that Rideout was first discovered by Defendant Beard.[21]  With respect to Beard's delay in calling Code Blue and the actions of Beard and other correctional staff once they entered the cell, the Scherr representation that O'Farrell was generally responsible for scheduling shifts and was responsible for extraction teams in general, does not, under the Iqbal or the Maldonado standards, create a triable issue as to O'Farrell's liability on a theory of deliberate indifference/failure to train.[22]  The fact that O'Farrell was involved in the post-suicide investigation and the review of Beard's conduct does not further Choate's case; this could only possibly be material to a claim that involved ongoing incidents of indifference in which such involvement would be relevant to the state of mind of any post-investigation recurrence.  See, e.g., Chao, 630 F. Supp. 2d at 177-78; see also cf. Whitfield, 431 F.3d at 9 -14.  As for the

---

[21]     Even if he was, say in his office and/or tuned into the SMU frequency, while events unfolded this would not, standing alone, be sufficient to tag him with liability.  See Maldonado, 568 F.3d at 274 -75 ("Here, the Mayor's promulgation of a pet policy that was silent as to the manner in which the pets were to be collected and disposed of, coupled with his mere presence at one of the raids, is insufficient to create the affirmative link necessary for a finding of supervisory liability, even under a theory of deliberate indifference. The Mayor is entitled to qualified immunity on the pleadings on the Fourteenth Amendment substantive due process claims."); see also Bettis v. Blackstone, No. 1:08-cv-01561-AWI-GSA PC, 2009 WL 2971364, 3  (E.D.Cal. Sept. 11, 2009) ("The whole of Plaintiff's allegations against Defendant Blackstone are that 'the [$30,000,000.00] check was obviously removed [from the mailing envelope] by an employee in the mail-room, supervised by defendant Lieutenant Blackstone or his predecessor.' This does not show that Defendant Blackstone engaged in any misconduct, nor did anything other than be the supervisor of the mail-room at the time Plaintiff feels that his check was removed from the mailing envelope. This does not state a cognizable claim against Defendant Blackstone.") (record citation omitted).

[22]     One of the concerns Choate raises vis-à-vis her other summary judgment motions is that officers entering the cell were more anxious to handcuff and shackle the unresponsive Rideout than interested in attending to proper CPR.  Choate has in no way created a genuine dispute of material fact that O'Farrell is responsible for this particular response.  And, although I have not had reason to refer to the video of the response of staff to Rideout once Code Blue was called by Beard in making my recommendation on this motion for summary judgment, I do note that the video belies any claim that this action, in and of itself, could give rise to a constitutional claim against O'Farrell.

21

adequacy of the medical response and the medical equipment, there is no dispute that O'Farrell does not and never has supervised prison medical personnels and he did not in any way supervise the medical team on duty the night that Rideout died.

Accordingly, based on this record and for the reasons set forth above, I recommend that the Court grant O'Farrell's motion for summary judgment.

## CONCLUSION

I now recommend that the Court enter judgment in favor of Riley and grant the motion to dismiss as to defendants Magnusson and Merrill and grant O'Farrell's motion for summary judgment.  If the Court accepts this recommendation as to O'Farrell his request for dismissal would be moot.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

October 20, 2009.