UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BRENDA CHOATE, Personal Representative of the Estate of Ryan Rideout,<br><br>　　　　Plaintiff<br><br>　　v.<br><br>JEFFREY MERRILL, et al.<br><br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)　Civil No. 08-49-B-W<br>)<br>)<br>)<br>) |

### *Recommended Decision on Motion for Summary Judgment filed by Michael Peters (Doc. No. 122)*

On October 5, 2006, Ryan Rideout died after he hung himself in Cell 114 of the B-side of the Special Management Unit of the Maine State Prison. His time of death has not been determined. There is no question that corrections and medical staff at the hospital tried to resuscitate him after the discovery of his attempt but there is some question about whether or not Rideout could have been revived had the correctional or medical staff acted with more haste in discovering the attempt and with more competence once the discovery was made.

Rideout's mother, Brenda Choate has sued multiple defendants in her capacity as the personal representative of her son's estate. Choate believes that these defendants violated the United States and the State of Maine Constitutions because they were deliberately indifferent apropos their responsibility to prevent her son's death.[1]

Defendant Michael Peters, one of the guards that responded to Cell 114 when Rideout was discovered hanging, has filed a motion for summary judgment which highlights his very limited involvement in the response. I recommend that the Court grant Peters's motion.

---

[1]　She also presses state-law wrongful death/conscious pain and suffering counts but makes it clear in her amended complaint that these counts are attached to the constitutional claims.   (See Fourth Am. Compl. ¶¶ 38, 39.)

# DISCUSSION

### A. Deliberate Indifference Standard

In <u>Manarite v. City of Springfield</u>, the First Circuit described the Eighth Amendment deliberate indifference standard for prison suicide cases:

> The Supreme Court has made clear that Section 1983 permits recovery for loss of life (or for serious physical harm) only where the defendant acts <u>intentionally</u> or with an analogous state of mind usually described as "<u>deliberate indifference</u>" to deprivation of the victim's constitutional right. <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991) ("deliberate indifference" standard in Eighth Amendment prison conditions case); <u>Canton v. Harris</u>, 489 U.S. 378, 388-90 (1989) (same in Fourteenth Amendment municipal liability, police denial of medical treatment case); <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-06 (1976) (same in Eighth Amendment prison medical treatment case).
> ….
> The cases also indicate that, when liability for serious harm or death, including suicide, is at issue, a plaintiff must demonstrate "deliberate indifference" by showing (1) an unusually serious risk of harm (self-inflicted harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk. The risk, the knowledge, and the failure to do the obvious, taken together, must show that the defendant is "deliberately indifferent" to the harm that follows.

957 F.2d 953, 955 -56 (1st Cir. 1992); <u>accord</u> <u>Bowen v. City of Manchester</u>, 966 F.2d 13, 17 (1st Cir. 1992).[2]

**Summary Judgment Standard**

"At the summary judgment stage," the United States Supreme Court explained in <u>Scott v. Harris</u>, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." 550 U.S. 372, 380 (2007) (citing Federal Rule of Civil

---

[2] The United States Supreme Court's <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994) made clear that to demonstrate recklessness sufficient to hold a defendant liable under the Eighth Amendment, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837. Thus, the <u>Manarite</u> test is consistent with <u>Farmer</u> and continues to be useful for correctional institution suicide cases because of its tailored analysis. <u>See</u> <u>also</u> <u>Pelletier v. Magnusson</u>, 201 F. Supp. 2d 148, 162-65 (D. Me. 2002). <u>Farmer</u> cited <u>Manarite</u> as one of the Circuit level cases requiring a showing of recklessness, as opposed to mere negligence. 511 U.S. at 836.

Procedure 56(c)). Scott reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id.  As condoned by the Scott majority, my review of the facts includes a careful consideration of the video tape of the response following the discovery of Rideout hanging in his cell. See Id. at 378-80 & ns. 6&7.

### B. Factual Record

#### 1. *Peters's Facts*

Michael Peters was one of many corrections officers who responded to the scene of the Ryan Rideout hanging. (SMF ¶ 1; Resp. SMF ¶ 1; SAMF ¶ 2; Resp. SAMF ¶ 2.) Immediately upon the entry of the corrections officers into the cell, Rideout was cut down. (SMF ¶ 2; Resp. SMF ¶ 2.) It was after he was cut down that Rideout was handcuffed and shackled. (SMF ¶ 3; Peters Aff. ¶ 3; Video of response.)[3] Rideout was not left hanging in order to be restrained.

---

[3] Choate qualifies this statement by noting that the medical examiner's report indicated that there were partially circumferential, faint red marks on Rideout's wrists and similar marks on his ankles, adding that the examiner learned after the autopsy that prior to the removal of Rideout from his cell his hands and feet "were bound together by some sort of hand and ankle cuff." (Resp. SMF ¶ 3; Med. Examiner Report at 3, Doc. No. 143-14 at 4.) The video bears out that there was an immediate effort by some of the responders to get Rideout in the restraints.

(SMF ¶ 4; Resp. SMF ¶ 4.)   At no time did Michael Peters refuse to let the medical team touch Rideout, let alone while leaving him hanging in order to restrain him. (SMF ¶ 5; Resp. SMF ¶ 5.)

 2. *Choate's Additional Facts*[4]

The guards who Joseph Bradley, an inmate at the prison, remembers being on duty that night of Rideout's death were officers Beard, Peters, and Sergeant St. Pierre. (SAMF ¶ 4; Bradley Dep. at 31: 18-19; Resp. SAMF ¶ 4.)  Bradley reports that Sergeant St. Pierre showed up to Rideout's cell with another sergeant and Peters, as well as a couple of guards from C-side. (SAMF ¶ 5;  Bradley Dep. at  35:19-21; Resp. SAMF ¶ 5.)  Upon entry into the cell, Sgt. St. Pierre used the "J" knife to cut the noose "on the right side of Rideout."  (SAMF ¶ 3; Resp. SAMF ¶3.)   Inmate Bradley testified that the guards responding handcuffed Rideout and shackled him before they started any CPR.  (SAMF 6;  Bradley Dep. at 36: 7-8.)  Peters responds correctly that the video shows that they shackled Rideout after the CPR started. (Resp. SAMF 6.)

According to Choate, Officer Peters and Beard held the legs of Rideout and lifted while Sergeant St. Pierre cut the noose on the right hand side of Rideout's neck.  (SAMF ¶ 9; Tupper Interview with St Pierre, Doc. No. 143-12.)   Peters points out the report relied on does not mention Peters and does not identify who held and lifted Rideout's legs while the noose was cut. (Resp. SAM ¶ 9.)   He notes that the video shows that there were officers on the scene who did not hold and lift-up Rideout's legs.  (Id.)   There is no dispute that when Rideout was cut down

---

According to Choate, the video of the hallway shows that the initial check of Rideout's cell was at 10:40 pm and Beard did not show up until 11:20 pm. (SAMF ¶7; Video, Pl.'s Ex. 3.) Peters responds that the video shows that the officer rounds were done at 10:53 p.m. and then again at 11:23 p.m. (Resp. SAMF ¶ 7.)  Peters is a correct description of what the video depicts.   What is more, there is no basis to connect Peters to any theory that he was somehow consciously dilatory with respect to his response obligations or time; the question of whether or not Defendant Beard can be held liable on such a theory is addressed in a separate motion for summary judgment.

[4]    Choate insists that Ira Scherr, a former MSP employee, states that "on information," Peters was in local control of Special Management Unit (SMU) at the time of Rideout's hanging. (SAMF ¶ 1; Scherr Aff. ¶ 20.) Peters points out that this statement is not made on personal knowledge.  (Resp. SAMF ¶ 1.) This is the only statement of fact that seems to be aimed at some sort of supervisory liability theory apropos Peters and it is blatantly insufficient to warrant further inquiry on that score.

4

his neck was not stabilized before being placed on his bunk. (SAMF ¶ 10; Spiller Mem. at 6 (Item K), Doc. No. 143-9; Resp. SAMF ¶ 10.)[5]

After being questioned by Sgt. Danny Picard about there being at least a 45-minute period between officer rounds, during which time Rideout committed suicide, Officer Peters spoke to Joseph Bradley. (SAMF ¶ 8; Report of Sgt. Danny Picard to D. Starbird ¶ 1, Doc. No. 143-18; Bradley Dep. at 37; 11-20.)[6] According to Bradley, as a direct result of the statement made to Sgt. Danny Picard -- "when they took the shackles off, and Beard and Peters both told [Bradley] to keep my mouth shut about the events that happened or else they were going to make the rest of my stay there a living hell." (SAMF ¶ 9; Bradley Dep. at 37: 11-20.) In response, Peters relies on his affidavit statement in which he avers:

> I never went with Bobby Beard to visit Joseph Bradley for either of us to tell him to keep his mouth shut about what happened to Rideout or to threaten to make his life a "living hell" if he did talk or anything to that effect. I never made any statements like that to Bradley nor did I witness Beard making any statements like that to Bradley.

(Peters Aff. ¶ 6, Doc. No. 124; Resp. SAMF ¶¶ 8,9.)

There is no genuine dispute that Peters was at all material times acting under color of state law. (SAMF ¶ 11; Resp. SAMF ¶ 11.)

C. **Recommendation**

Under the Eighth Amendment deliberate indifference standard articulated in Manarite and the summary judgment teaching of Scott (including the majority's reliance on the video in reaching its determination) I conclude that Peters is entitled to judgment as a matter of law. Taking the facts set forth above and viewing the video in a light most favorable to Choate, I

---

[5] I have stricken the part of this statement of additional fact that asserts that this occurred before Peters shackled Rideout as the cited exhibit does not mention Peters much less attribute any conduct to him.
[6] Peters correctly points out that the Starbird report filed by Choate does not identify the inmate who so advised Starbird of the 45 minute lapse; the name is whited-out.

conclude that there is not a triable case against Peters for his participation in the events that night. Id. at 378-80 & ns. 6&7. It is true that Choate has attempted to create a dispute of fact about Peters threatening Bradley after the fact to somehow cover-up the events of the night but this alone does not create a triable issue about whether or not Peters was deliberately indifferent to Rideout apropos his participation in the team entering the cell and cutting Rideout down. If one views the video it does appear that there was no attempt to stabilize Rideout's neck in the seconds that transpired between entry into the cell and the cutting-down and placement of Rideout on his bunk. Peters does not dispute this. At most this is evidence of negligence. This lapse does not alone allow an inference that Peters's response was somehow indicative of an intent to punish Rideout, and, again, the video is evidence on this score. There is no evidence that Peters had actual knowledge of or willful blindness to the risk of further damage to Rideout's neck or that it should have been obvious to him that he had to take steps to address that known, serious risk. Otherwise, the extent of Peter's involvement per Choate[7] was the lifting of Rideout's body to avoid further damage to the neck and the application of shackles which did not interfere with the commencement of CPR or the actions taken by the medical staff when they arrived in the cell.[8] Disturbing though it is to view the video of officers shackling a dead or dying man, ostensibly out of "security" concerns, on this record, Peters is entitled to judgment as a matter of law.

---

[7] It is odd to me that Peters elects not to identify which of the officers in the video is in fact him. (Resp. SAM ¶ 9.) There is no dispute that it was St. Pierre who actually cut Rideout's noose, which leaves Peters with one of the 'supporting roles.'

[8] In setting forth additional facts responding to Peters's motion Choate has not attempted to create a dispute as to whether or not any of these listed shortcomings actually had a causal relation to Rideout's demise. In other words, these parties have not joined issue in this motion on the question of whether or not Choate can create a triable issue through her expert witness that Rideout could have been revived by the time Peters responded to his cell that night.

## CONCLUSION

For the reasons stated above, I recommend that the Court grant Defendant Peters's motion for summary judgment.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

October 20, 2009