UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BRENDA CHOATE, Personal Representative of the Estate of Ryan Rideout, | ) ) ) ) |
| Plaintiff | ) ) |
| v. | ) Civil No. 08-49-B-W |
| JEFFREY MERRILL, et al. | ) ) ) |
| Defendants | ) |

*Recommended Decision on Motion for Summary Judgment
filed by Bobby Lee Beard  (Doc. No. 130)*

On October 5, 2006, Ryan Rideout died after he hung himself in Cell 114 of the B-Wing in the Special Management Unit of the Maine State Prison.  His time of death has not been determined.  There is no question that corrections and medical staff at the hospital tried to resuscitate Rideout after the discovery of his attempt but there is some question about whether or not Rideout could have been revived had the correctional or medical staff acted with more haste in discovering the attempt and with more competence once the discovery was made.

Rideout's mother, Brenda Choate has sued multiple defendants in her capacity as the personal representative of her son's estate.  Choate believes that these defendants violated the United States and the State of Maine Constitutions because they were deliberately indifferent to the prevention of his death once he was discovered.[1]

Defendant Bobby Lee Beard was the correctional officer who first found Rideout hanging in his cell and there is evidence -- in the form of a video of the corridor and the internal investigation written reports -- that Beard delayed responding to Rideout's hanging, something

---

[1]  She also presses state-law wrongful death/conscious pain and suffering counts but makes it clear in her amended complaint that these counts are attached to the constitutional claims.   (See Fourth Am. Compl. ¶¶ 38, 39.)

that is certainly puzzling and troubling. Based on the following legal standards and the factual record, I recommend that the Court deny Beard's motion for summary judgment.

## DISCUSSION

*Deliberate Indifference Standard*

In Manarite v. City of Springfield, the First Circuit described the Eighth Amendment deliberate indifference standard for prison suicide cases:

> The Supreme Court has made clear that Section 1983 permits recovery for loss of life (or for serious physical harm) only where the defendant acts intentionally or with an analogous state of mind usually described as "deliberate indifference" to deprivation of the victim's constitutional right. Wilson v. Seiter, 501 U.S. 294 (1991) ("deliberate indifference" standard in Eighth Amendment prison conditions case); Canton v. Harris, 489 U.S. 378, 388-90 (1989) (same in Fourteenth Amendment municipal liability, police denial of medical treatment case); Estelle v. Gamble, 429 U.S. 97, 104-06 (1976) (same in Eighth Amendment prison medical treatment case).
> The Supreme Court has also made clear that, by "deliberate indifference," it means more than ordinary negligence, and probably more than gross negligence. Canton, 489 U.S. at 388 n. 7 ("some [lower] courts have held that a showing of 'gross negligence'" is adequate, "[b]ut the more common rule is ... 'deliberate indifference'" ); Daniels v. Williams, 474 U.S. 327, 328 (1986) (civil rights laws do not permit recovery based on simple negligence).
> ….
> The cases also indicate that, when liability for serious harm or death, including suicide, is at issue, a plaintiff must demonstrate "deliberate indifference" by showing (1) an unusually serious risk of harm (self-inflicted harm, in a suicide case), (2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendant's failure to take obvious steps to address that known, serious risk. The risk, the knowledge, and the failure to do the obvious, taken together, must show that the defendant is "deliberately indifferent" to the harm that follows.

957 F.2d 953, 955 -56 (1st Cir. 1992); accord Bowen v. City of Manchester, 966 F.2d 13, 17 (1st Cir. 1992).[2]

---

[2] The United States Supreme Court's Farmer v. Brennan, 511 U.S. 825 (1994) cited Manarite as one of the Circuit level cases requiring a showing of recklessness, as opposed to mere negligence. 511 U.S. at 836. Farmer made clear that to demonstrate recklessness sufficient to hold a defendant liable under the Eighth Amendment, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm

*Summary Judgment Standard*

"At the summary judgment stage," the United States Supreme Court explained in Scott v. Harris, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." 550 U.S. 372, 380 (2007) (citing Federal Rule of Civil Procedure 56(c)). Scott reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id.

*Facts*

Beard was a correction officer for the Maine Department of Corrections (DOC) from 2003 until 2007. (SMF ¶ 1; Resp. SMF ¶ 1; SAMF ¶ 1; Resp. SAMF ¶ 1.) During his four years of employment with the DOC, Beard was posted at the Special Management Unit (SMU) of the Maine State Prison. (SMF ¶2; Resp. SMF ¶ 2; SAMF ¶ 2; Resp. SAMF ¶ 2) Beard received what he describes as limited training in suicide prevention and dealing with inmates with mental

---

exists, and he must also draw the inference." Id. at 837. Thus, the Manarite test is consistent with Farmer and continues to be useful for correctional institution suicide cases because of its tailored analysis. See also Pelletier v. Magnusson, 201 F. Supp. 2d 148, 162-65 (D. Me. 2002).

health problems; he received a total number of approximately eight hours of such training. (SMF ¶ 3; Resp. SMF ¶3; SAMF ¶ 3; Resp. 3.) Beard insists he was not aware of any particular mental health problems suffered by Ryan Rideout and was not aware of Rideout's mental health history. (SMF ¶ 4; Beard Aff. ¶ 4.)

On October 5, 2006, the day of Rideout's suicide, Beard was working the nighttime shift at the SMU. (SMF ¶ 5; Resp. SMF ¶ 5; SAMF ¶ 4; Resp. SAMF ¶ 4.) Officers Black and Beard conducted rounds that night and during those rounds they took turns observing Rideout's wing every thirty minutes. (SMF ¶ 6; Resp. SMF ¶ 6.)

Beard maintains that while he was conducting his round at approximately 11:30 p.m. he observed Rideout up against the wall with a white object around his neck. (SMF ¶ 7; Resp. SAMF ¶ 5; Beard Aff. ¶ 8.) He indicates that he then made a quick check of the other cells and asked Officer Black to retrieve a J knife, which is a special knife used to cut away objects that may be tied around a prisoner's neck. (SMF ¶ 8; Beard Aff. ¶ 9.) He then went back to Rideout's cell and called Code Blue. (SMF ¶ 9; Beard Aff. ¶ 10.) After calling Code Blue, Beard stood outside the cell waiting for other personnel to respond. (SMF ¶ 10; Beard Aff. 11.)  Beard insists that prison protocol did not permit him to enter Rideout's cell until the shift sergeant authorized entry.  (SMF ¶ 11; Beard Aff. ¶ 12.) For her part, Choate cites to the December 12, 2006, Critical Incident Review report stating: "We are unable to locate a written procedure or practice in policy or post orders requiring authorization by supervisory staff to open a cell when two staff persons are present in an emergency situation." (Resp. SMF ¶ 11; Dec. 12, 2006, Internal Mem. at 3, Doc. No. 143-7.)

Once Officer Blake and Peters and Sergeant St. Pierre were present, St. Pierre called for the cell door to be opened; approximately two to three minutes elapsed from the time Beard

4

called Code Blue and the time personnel were authorized to enter Rideout's cell. (SMF ¶¶ 12, 13; Beard Aff. ¶¶ 13, 14; Resp. SAMF ¶ 12.) Once inside Rideout's cell St. Pierre instructed Peters and Beard to grab Rideout's legs, lift him up, and place him on the bunk. (SMF ¶ 14; Beard Aff. ¶ 15; Resp. SAMF ¶ 14.) Beard maintains that after they placed Rideout on the bunk he left the cell so that medical personnel could attend to Rideout. (SMF ¶ 15; Beard Aff. ¶ 16.)

According to Choate, Beard, during his first pass down Lower Corridor B while conducting his round, did in fact stop and look into Cell 114 for 58 seconds (while holding a coffee cup), and saw Rideout hanging by the neck from the sprinkler in his cell. (SAMF ¶ 5; Resp. SMF ¶¶ 7, 13.) She relies on a memorandum by Ralph Nichols and Major James O'Farrell from the Maine Department of Corrections Inspections Division that made the following findings:

> Based on our investigation which included three interviews with Officer Beard, we found that Officer Beard during his first pass down Lower Corridor B while conducting his round, did in fact stop and looked into Cell #114 for 58 seconds and saw Prisoner Rideout hanging by the neck from the sprinkler in his cell. <u>Without taking any action as required by emergency operational procedures and his training</u> Officer Beard then continues on his round without calling the required Code Blue.[3] This fact is further supported by Officer Beard's action as he walks back to Cell #114, after completing his round, the second time and begins to take out his radio to call a Code Blue just before he reaches Cell #114 showing he already knew that Prisoner Rideout was committing suicide by hanging and would call a Code Blue.[4] In our first and second interview with Officer Beard, he asserted that he walked past Cell #114 and did not stop and look into the cell. When we showed Officer Bead the video surveillance tape that recorded Officer Beard's action as he conducted his round, he admitted he must have stopped and remained at Cell # 114 as the video recording shows, but does not remember doing so and offered no explanation why he had not included this information in his written statement.

---

[3] (Resp. SMF ¶ 8.)
[4] (Resp. SMF ¶ 9.)

5

(MDOC Nov. 28, 2006, Mem. at 2, Doc. No. 14-6) (emphasis added)( see also SAMF ¶¶ 11-13; Resp. SAMF ¶¶ 11-13).

Choate's additional evidence is as follows. Beard responded to the Intercom Buzzer Message of Matthieus O'Rourke on October 5, 2006. (SAMF ¶ 6; Resp. SAMF ¶ 6.) According to Choate, Beard responded to the O'Rourke intercom call to local control approximately 20 minutes after it was placed. (SAMF ¶ 7; O'Rourke Dep. at 33:9-11.) Beard denies this indicating that Danielle Wilson, working in the control room "'stated from the time she notified Officer Beard to the time the 'code blue' medical emergency was called was a matter of minutes.'" (Resp. SAMF ¶7.)[5]

Beard asked O'Rourke directly why he had pushed his button. (SAMF ¶ 8; Resp. SAMF ¶ 8.) O'Rourke's response to the Beard question was: "I said I don't need you, Beard, my next door neighbor has hung himself, you need to check on him." (SAMF ¶ 9: O'Rourke Dep. at 33: 24-25.) Beard adds that he was made aware of the emergency button having been activated at the time that he and the other officer were getting up to make their 11:30 round, at that point the phone rang, Beard answered, and was informed that the cell number was 111, 112 or something of that like. (Resp. SAMF ¶ 9; Beard Dep. at 35: 4-8.)

---

[5] In denial of this statement Beard cites to the Choate's Statement of Additional Fact ¶ 32 and Plaintiff's Exhibit 18, both directed at Defendant O'Farrell's motion for summary judgment. That statement reads: "Within hours of Rideout's suicide, Officer Danielle Wilson, who was in the control tower, could not remember which cell Rideout was in. His cell sent an Emergency buzzer after he died. Plaintiff's Exhibit # 18, (*State Police DetectiveTupper interview*)." Exhibit 18, The Tupper Interview Report of Wilson adds, as relevant to this dispute, very little clarification of the issue:
> Officer WILSON advised me she was working in the local control room the night of RIDEOUT'S suicide. According to Officer WILSON, at approximately 2330 hours the inmate in cell 114 pressed his emergency button. Officer WILSON stated she then notified Officer BEARD that the inmate in cell 114 had pressed his emergency button. Officer WILSON advised me Officer BEARD went to do his check of the inmate. Officer WILSON stated from the time she notified Officer BEARD to the time the "code blue" medical emergency was called was a matter of minutes. Officer WILSON stated the code blue was call[ed] because the inmate in cell 113 had hung himself.

(Summary of Wilson Interview at 1, Doc. No. 146-3.)

According to Choate, Beard "...strolled over (to Rideout's cell) and looked in the window and said Rideout, 'get down from there', these are his exact words...when he didn't respond to him, he said you've got to do better than that and then he continued on his check down the corridor." (SAMF ¶ 10; O'Rourke Dep. at 34: 1-6.)  Beard responds that this is an accurate citation to the record.  He qualifies by citing his affidavit statements:  " I observed Ryan Rideout up against the wall with a while object around his neck.  I made a quick check of the other cells and asked Officer Black to retrieve a J knife … I then went back to Ryan Rideout's cell and called code blue."  (Resp. SAMF ¶ 10; Beard Aff.  ¶¶ 8-10.)

Per Choate, the time that Officer Beard called the Code Blue was at 23:25:35. (SAMF ¶ 14; Nichols Dec. 12, 2006, Report at 2, Doc. No. 143-7; Resp. SMF ¶ 13.) [6]  The investigation revealed:  "While Officer Black arrived at the scene in 28 seconds, no immediate action was taken by the two officers (Black & Beard) to enter the cell to lift the prisoner to help relieve pressure from the noose around Prisoner Rideout's neck."  (SAMF ¶ 15; Nichols Dec. 12, 2006, Report at 2, Doc. No. 143-7; Resp. SMF ¶ 10.)  Beard again qualifies this statement by noting that the report relied on further states:  "Operational practices require 2 officers to be present before entering a high risk cell as a security precaution and only with authorization from their supervisors to open the cell."  (Resp. SAMF ¶ 15; Nichols Dec. 12, 2006, Report at 2, Doc. No. 143-7.)  He also relies on his own affidavit which states the prison protocol did not permit him to enter Rideout's cell until the shift sergeant had authorized entry.  (Resp. SAMF ¶ 15; Beard Aff. ¶ 12.)

---

[6]  Beard purportedly qualifies this statement by indicating:  "The record cited also referred to the time of the Code Blue as '…2331 hours, at the Maine State prison …'"  (Resp. SAMF ¶ 14.) I could not identify the part of the December 12, 2006, Nichols report that so indicated.

7

According to St. Pierre, Rideout was still white in the face and he felt they had a chance to revive him. (SAMF ¶ 17; Resp. SAMF ¶ 17; Resp. SMF ¶ 16.)  The exact time of death of Rideout is unknown by anyone. (SAMF ¶ 18; Resp. SAMF ¶ 18.)   Beard notes that Choate's medical expert, Charles E. Abney, M.D., could not say "one way or another and, certainly not to a reasonable degree of medical certainty," whether or not Rideout was salvageable at the time that Beard first came upon him.  (SMF ¶ 16; Abney Dep. at 203:18-25.)  He also points to the opinion of Edward B. Sussman, M.D., that it is more likely than not that Rideout was non-resusistatable when Beard called Code Blue.  Even if Beard had called Code Blue when Beard first saw Rideout, Sussman concluded, if the response times, physical access to Rideout in his cell, resuscitation procedures, including application of the chest compression, ventilation and defibrillation were exactly the same, then Rideout would still have more likely than not suffered irreversible severe, likely fatal, hypoxic brain damage. (SMF ¶¶ 17, 18; Sussman Aff. & Letter at 4-5.)

Choate retorts that Abney did testify that the automated external defibrillator (AED) shocked Rideout one time in the medical unit and that in order for it to shock there is usually some cardiac rhythm present, while acknowledging that he stated: "My gut feeling was he was dead when they go in there, but that made me have some doubt about that."  (Resp. SMF ¶ 16; Abney Dep. at 202-03.)  With respect to Doctor Sussman's opinion, Choate also insists that the hypoxia was deemed due to the delayed application of CPR, including effective ventilation. (Resp. SMF ¶ 17.)   Choate faults the report for not attempting to excuse the fact that Beard looked into the cell for 59 seconds and then completed his rounds before calling the Code Blue,

and then waiting an additional three minutes to open the door. (Id.) [7] Choate's case is basically: "If Ryan had a white face … had red wrist marks, and ankle marks, as autopsied … and reacted to the AED defibrillator in the medical department several minutes later … had a cardiac rhythm, even may have died in the hospital, it is a mixed question of fact and law whether only GOD can say how this man would have ended up." (Resp. SMF ¶18.)

Per Rideout's fellow inmates Joseph Bradley, Jesus Rodriguez, and Matthieus O'Rourke pushing emergency buzzers is what prisoners do when inmates try to hang up or commit suicide or have medical emergencies. (SAMF ¶ 23; Rodriguez Aff.; Bradley Dep. at 23; O'Rourke Dep. at 13.)[8] In his affidavit relied on by Choate, Rodriguez opines:

> I was in segregation unit at the Maine State prison because my daughter (8) Fantasia passed away in a car accident in Hartford, Conn. By a drunk driver who rear ended my sister's car. I was placed in the segregation unit because one of the officers thought I could be suicidal. While I was at the segregation unit, Ryan Rideout and I became good friends. He received a bad letter from someone that day, because he told me about the letter and he was crying. He told me who the letter was from but I cannot remember. He told Correction Officer Beard that he was going to hang himself that day and Correction Officer Beard walked away. When Correction Officer Beard heard the comment about Ryan's desire to hang himself, Beard stated to Rideout that, "You don't have the balls to hang yourself." Then Officer Beard left and went to the desk, grabbed his coffee and left the unit, which I assumed was his cigarette break. The break lasted at least fifteen minutes and could have been one half hour. I then saw Beard return to do his rounds, went door to door, and when he got to Ryan Rideout's door, he said, "You can do better than that." Then he completed his round, checked additional cells down the hallway then he returns. Correction Officer Beard then said, "I'm not playing anymore, get down." Beard then paused as if he was waiting for a response, then waited a couple of minutes be[fore] he hit the man down button on his collar.

---

[7] As part of her response to Paragraph 17 of Beard's Statement of Fact, Choate interjects that there was some sort of tampering with the videos of the cell block prior to the response to Rideout's emergency and the hand-held video documenting the entrance of officers and the medical personnel into the cell and the aftermath of that response. She has submitted a document in support of this claim as part of her response to the pending dispositive motions. This submission does not attempt to explain the qualifications of the affiant and Choate does not address the question of the validity of the video tapes in any meaningful manner in her consolidated memorandum responding to the half-dozen dispositive motions.

[8] Beard qualifies this statement by noting that the O'Rourke Deposition stated: "They're utilized the most when people cut up or try to harm themselves in any way or if they need help in their cells for a medical issue." (Resp. SAMF ¶ 23; O'Rourke Dep. at 13.)

> Four officers from the unit then stood around. Beard continued to drink his coffee. The others had gloves on waiting for the medical staff to arrive, but no one entered the room, but continued to stand around talking and laughing. There were two rookies, Officer Beard, Officer Abbott, Corey Roberson and Officer Fance were the rookies. Robertson and Fance were the rookies; Beard and Abbott were the regulars. No one entered the cell of Ryan Rideout, and Capt. Abbott, the Rookie's father opened the door about 7-8 minutes after the call from Beard. Capt. Abbott ordered every inmate to sit on their bunks …. When the medical team arrived after Beard called, Capt. Abbott went into the unit to install handcuffs and shackles on Ryan before cutting him down. I saw Ryan Rideout covered up with a blanket, a white cotton hospital blanket, and you could see the shackles hanging from the gurney. When my daughter was killed by a drunk driver, I did slash my wrist and was bleeding in spurts, profusely, yet the corrections officer did handcuff my hands behind my back and did shackle my feet and to my hands before I was given medical treatment. They took me from my cell to the segregation unit to get medical treatment and I continued to bleed at least 10 minutes.
>
> While Ryan Rideout was in the process of hanging, the whole tier, Room 111 to Room 125 was ringing the buzzer was not responded to by anyone. The reason was it was turned off in the tower. Usually when the buzzer is hit an officer or supervisor will come into the pod, and during the Ryan Rideout hanging, no one responded.
>
> I rang the buzzer seven to eight times and got no response from anyone. I pounded on the door until my leg started to go numb and still got no response.
>
> Sammy Caison was on suicide watch on the regular pod in Room 118, watched by Correction Officer Corey Robertson. All Correction Officer Corey Robertson had to do was to stand up from his char and he would have seen Ryan Rideout hanging. He did nothing to assist Ryan Rideout because the man who is guarding on suicide watch can do nothing.
>
> Present at the time were Samuel Caison, Tino Marino, Louis Rodriguez (now at Bolduc), Dean Brown, myself, Chris Bennett (Cell 111).

(J. Rodriguez Aff. At 1- 3, Doc. No. 143-10.)[9]

Officer Beard's testimony on January 23, 2009, was that there are no occasions when emergency buzzers are not responded to. (SAMF ¶ 25; Resp. SAMF ¶ 25.) With respect to the internal investigation conducted prior to November 28, 2006, Beard:

> described an unwritten practice by SMU staff in response to the discovery of prisoner attempts/ threats to commit suicide. He contends and described a practice

---

[9] Attached to this affidavit are Jesus Rodriguez's two sketches of the cells of the inmate-witnesses in relation to each other's.

>of ignoring a prisoner's threat/ attempt of suicide based on the belief that the prisoner is only trying to gain attention in order to have the Officer call a supervisor to the scene so the prisoner can talk to the supervisor.

(SAMF ¶ 22; Nichols Internal Mem. at 2, Soc. No. 143-7.)[10]

*Recommendation*

I have watched the video of the corridor for that night. It appears to me that the checks/ sweeps were conducted every thirty minutes from ten o'clock on. It is also clear that from the video and the internal follow-up reports that Beard waited close to a minute after first discovering Rideout to call Code Blue and that there is significant evidence -- the video, the reports of other inmates, and the reports from the prison's internal review -- that Beard's delay in calling Code Blue and entering the cell was 'deliberate.' That is, there is enough dispute on this record as to whether Beard had actual knowledge of or was willfully blind to Rideout's risk of death by suicide and whether he failed to take obvious steps to address that known, serious risk. Manarite, 957 F.2d at 956. And given the evidence that St. Pierre had an expectation that Rideout could be saved once the correctional staff entered the cell and that the AED gave one shock when first applied, it also remains for a jury to measure Beard's role in the response and to deduce if there is a sufficient causal link between this response and Rideout's ultimate demise.

---

[10] There is also no dispute as to the following facts pertaining to Beard's legal representation. Officer Beard admitted in deposition that the State of Maine is underwriting the cost of his defense in this case. (SAMF ¶ 19; Resp. SAMF ¶ 19.) Attorney General Stephen Rowe authorized defense of Beard on May 8, 2008. (SAMF ¶ 20; Resp. SAMF ¶ 20.) The Agreement binds Mr. Bischoff, Beard's attorney not to represent clients who may be adverse to the Department of Corrections (which has raised an intervening cause defense) or its employees during the time he provides representation pursuant to this authorization. (SAMF ¶ 21; Resp. SAMF ¶ 21.) I reject Choate's argument that there is any inference that can be drawn from these facts that this cost underwriting is in some way collusive in the sense that it could impact the litigation tactics of the various defendants.

*Conclusion*

I conclude that there is a genuine dispute as to the facts material to Beard's liability under the Eighth Amendment and I recommend that the Court deny Beard's motion for summary judgment.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk

U.S. Magistrate Judge

October 20, 2009.